## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GORDMANS STORES, INC., *et al.*,[1] | ) | Case No. 17-80304 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF
## JAMES B. BROWN IN SUPPORT OF FIRST DAY MOTIONS

I, James B. Brown, hereby declare under penalty of perjury to the best of my knowledge, information, and belief:

1.      I am the Chief Financial Officer and Executive Vice President of Gordmans Stores, Inc. ("Gordmans Stores"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned case and the ultimate parent of the other Debtors.  I initially joined Gordmans Stores in 2015, and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, include: Gordmans Stores, Inc. (1987); Gordmans, Inc. (1211); Gordmans Management Company, Inc. (5281); Gordmans Distribution Company, Inc. (5421); Gordmans Intermediate Holdings Corp. (9938); and Gordmans LLC (1987).  The location of the debtors' service address is:  1926 South 67th Street, Omaha, Nebraska, 68106.

3.      I am authorized to submit this declaration (this "Declaration") on behalf of the Debtors and do so to assist the Bankruptcy Court for the District of Nebraska (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today.

4.      The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  I further believe the relief requested in the First Day Motions will aid in the implementation of timely and efficient chapter 11 cases that will preserve and maximize the value of the Debtors' estates.

## Introduction

5.      Together with their predecessors, the Debtors have operated in the retail industry for more than 100 years, starting as a small retail store in Omaha, Nebraska, where they evolved into a moderately-priced promotional department store concept that provides their customers with apparel, home goods, and other merchandise.  Today, the Debtors operate over 100 stores in 22 states in a variety of shopping center formats, including shopping malls and lifestyle centers, in addition to operating an e-commerce site.

6.      Gordmans Stores is a public company with common stock that is traded on the NASDAQ stock market, listed under the ticker symbol GMAN.[2]  Gordmans Stores completed an

---

[2]    As noted in its Form 8-K filed on November 1, 2016, Gordmans Stores received a deficiency letter from the Listing Qualifications Department of NASDAQ Stock Market LLC notifying Gordmans stores that the closing bid price for its common stock had closed below the minimum $1.00 per share requirement for continued listing on the NASDAQ Stock Market.

initial public offering in 2010.  Funds managed by Sun Capital Partners, Inc. ("Sun Capital") collectively hold approximately 49.6 percent of Gordmans Stores' equity.  During the fiscal year 2016, the Debtors generated revenues totaling approximately $610.5 million on a consolidated basis, consisting of approximately:    (a) 55.9 percent of revenues arising from the sale of apparel; (b) 28.6 percent of revenues arising from the sale of home goods; and (c) 15.5 percent of revenues arising from the sale of other merchandise, including fragrances and accessories.  As of the date hereof, the Debtors' aggregate funded debt balance consists of approximately $65.9 million in secured indebtedness, as described in detail below.

7.    Like many other apparel and retail companies, the Debtors have fallen victim in recent months to adverse macro-economic trends, especially a general shift away from brick-and-mortar to online retail channels, a shift in consumer demographics, and expensive leases. These trends have directly affected the Debtors' sales and operations.  Comparable store sales for February 2017 declined more than double than what the Debtors anticipated.  The Debtors projected comparable store sales for the month of February 2017 to decline 9.5 percent, or approximately $4.2 million, and actual comparable store sales for the month declined approximately 20 percent, or $8.8 million.

8.    The Debtors have at all times been mindful of their commitments to stakeholders and their obligation to preserve and maximize value.  To this end, and faced with this challenging backdrop, the Debtors revised their merchandise inventory receipts and sales plans downward for the second quarter of 2016 to reflect their belief that the challenging retail sales environment would continue.  Additionally, the Debtors also undertook steps to minimize costs and preserve liquidity.  These steps included, among other things, engaging a nationally-reputed retail consulting firm to assist in cutting the Debtors' stores, distribution, and corporate expenses.

3

9.      The Debtors began implementing cost-cutting initiatives in the second quarter of 2016.  Among other things, the Debtors reduced their inventory receipts by approximately $27 million, as compared to the same period during 2015.  Despite these and other efforts, however, the Debtors' sales loss accelerated to approximately $15.5 million below what it was in 2015, or about 11.1 percent on a comparable-store basis.  The challenging environment of the retail industry as a whole exacerbated the Debtors' financial distress, as credit tightened across the entire industry, causing the Debtors to experience increased challenges in purchasing goods on credit.

10.      The challenging sales environment continued throughout the second half of 2016 for the Debtors and the retail industry as a whole.  The Debtors' comparable store sales further decreased by approximately $32.8 million, or about 9.4 percent, as compared to 2015.  The factoring and vendor community in the retail industry further tightened credit, which significantly affected the Debtors.  (Approximately half of the Debtors' merchandise procurement is from vendors that factor their receivables.)  This required the Debtors to increasingly purchase merchandise on shorter terms or, in some cases, on a cash-on-delivery basis.  The Debtors continued to cut expenses in the second half of 2016, but could not reduce their costs enough to offset the decreased cash flow from reduced sales.

11.      As a result of these factors, and as discussed in greater detail below, in July 2016, the Debtors engaged Duff & Phelps Securities, LLC ("D&P") to act as their financial advisor and to explore alternatives as to fulfill these commitments and maximize stakeholder value.  In September 2016, in connection with this process and after failed negotiations with an interested party, the Debtors and D&P contacted approximately 80 potentially interested parties, including 14 strategic parties and 70 financial parties.  By November 2016, approximately 34 parties

4

entered into confidentiality agreements with the Debtors as to begin the diligence process and negotiations toward a transaction.

12.     Despite these efforts, nothing materialized from this marketing process, and from November 2016 through February 2017, the Debtors continued to work with D&P to develop and explore several strategic alternatives to maximize value.  However, the Debtors' financial position continued to deteriorate, especially in February 2017.  As noted, in February 2017, the Debtors' comparable store sales decreased by approximately $8.8 million, or about 20 percent. And, around March 1, 2017, a majority of the Debtors' vendors began to refuse to ship new inventory.  This further exacerbated the Debtors' financial distress, and the Debtors struggled to maintain the required availability to maintain compliance with their lender covenants and meet their payment obligations in the ordinary course.

13.     The Debtors' circumstances mirror those of the retail industry in general.  In recent weeks, numerous retailers have filed for chapter 11 protection, including HHGregg, The Limited, BCBG Max Azria, and American Apparel.  It is likely that other retailers may commence chapter 11 cases in the near term, as retail is set to replace the troubled oil and gas industry as the most distressed sector this year.[3]

14.     The Debtors sought to implement a liquidation process or sale process in connection with a chapter 11 filing, to concentrate its store base, rationalize its fixed costs, and preserve and maximize value.  Beginning March 1, 2017, the Debtors and D&P engaged in a significant marketing process to solicit bids for the Debtors' assets and/or for the Debtors' business as a going concern.  By March 10, 2017, D&P contacted a total of approximately 101 potentially interested parties, including the same parties originally contacted starting in

---

[3]      http://www.marketwatch.com/story/retail-industry-is-expected-to-replace-oil-and-gas-as-2017s-distressed-sector-2017-02-15.

KE 45939741.3

September 2016, which included approximately 15 strategic parties and 86 financial parties.  Of these, and since September 2016, approximately 41 parties entered into confidentiality agreements with the Debtors and began conducting due diligence.

15.     By March 10, 2017, the deadline for interested parties to submit bids to the Debtors, the Debtors received bids for a potential going-concern sale, liquidation, or other transaction disposing of the Debtors' assets.  The Debtors and their advisors negotiated with multiple bidders, and ultimately determined that a joint bid by Tiger Capital Group, LLC and Great American Group, LLC (together, the "Stalking Horse Liquidator") to liquidate substantially all or substantially all of the Debtors' assets offered the best available alternative given the circumstances, as discussed in further detail below.

16.     With the continued distress of the retail industry, the Debtors expect continued weakness in their sales for the foreseeable future.  Due to this sales risk and the potential for insolvency in winding down their operations, the Debtors seek to accelerate the process for a potential liquidation or other disposition of their assets.  To that end, the Debtors have commenced these chapter 11 cases to facilitate a timely and efficient process that will monetize the Debtors' assets and maximize the value of the Debtors' estates.  Consistent with and to continue this process, the Debtors filed a motion seeking approval of bidding procedures, which procedures are designed to both facilitate a process that will maximize value for the benefit of stakeholders.  The Debtors hope that the overall process itself will minimize the Debtors' expected stay in chapter 11 and related costs.  Moving with speed and obtaining the relief sought in the First Day Motions is critical to the Debtors' ability to continue operating as a going concern, and the success of these chapter 11 cases.

KE 45939741.3

17.    To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration as follows.  **Part I** describes the Debtors' business and their capital structure.  **Part II** details the circumstances surrounding the commencement of these chapter 11 cases.  Finally, **Part III** sets forth relevant facts in support of each of the First Day Motions filed in connection with these chapter 11 cases.

**Part I**
**General Background**

I.    **The Debtors' Corporate History and Business Operations.**

    A.    **General Background.**

18.    The Debtors' roots trace back to a small retail store at the corner of North 16th Street and Chicago Street in Omaha, Nebraska, started by a Russian immigrant named Sam Richman in 1915, which expanded into several department store locations over the next several decades.  In 1975, the Debtors' predecessors opened a second group of retail stores, the concept of which was to sell merchandise from the department stores at a discount, which eventually grew into the Debtors' stores today.  In 1992, the Debtors' predecessors in interest filed for chapter 11 protection in the District of Nebraska.[4]  After the their 1992 chapter 11 cases, the Debtors' predecessors closed all of their department store locations, and solely focused on their discount store division.  On September 17, 2008, shareholders sold 100 percent of the outstanding stock of Gordmans Stores to funds managed by Sun Capital Partners, Inc. ("Sun Capital").  Gordmans Stores completed an initial public offering in 2010, and a subsequent public offering in 2012.  Today, Sun Capital holds approximately 49.66 percent of the outstanding common stock of Gordmans Stores.

---

[4]    Case Nos. 92-81073, 92-81074, 92-81075.

KE 45939741.3

**B.      The Debtors' Business Operations.**

19.      Today, the Debtors operate over 100 retail locations in 22 different states across the United States, two distribution centers, and are in the second year of their e-commerce operations.  The Debtors operate as a value-priced department store, generally specializing in the sale of apparel and home décor, with their stores generally being the primary or secondary anchor in shopping centers.  The Debtors' business is subject to the seasonal fluctuations typical of the retail industry, and the Debtors realize a disproportionate amount of their sales and net income during the fourth quarter, which includes the holiday selling season.

**1.      Vendors and Inventory**

20.      The Debtors maintain an integrated supply chain.  The Debtors historically have been able to provide their customers with up to 60 percent lower prices than traditional department stores in part by leveraging their purchasing arrangements with suppliers.  In exchange for favorable pricing, the Debtors do not ask vendors for mark-down allowances, return privileges, or other chargeback fees.

21.      The Debtors have two distribution centers:  a 380,000 square foot facility in Omaha, Nebraska, and a 545,000 square foot facility near Indianapolis, Indiana.  Through third-party national and international freight and logistics companies, the Debtors coordinate inventory pick-up from their vendors for delivery to their distribution centers, where the inventory is received, inspected, processed, and distributed to the Debtors' retail stores.

KE 45939741.3

### 2.    Employees

22.    As of the Petition Date, the Debtors employ approximately 5,094 employees, of which approximately 342 are exempt, 1,083 are full-time, and 3,669 are part-time.  None of the Debtors' employees are represented by collective bargaining units.

### 3.    Licensing Agreements

23.    The Debtors have outsourced their footwear business since 1997, which currently represents approximately 5 percent of the Debtors' total net sales, including sales of licensed product.  In 2004, the Debtors entered into a licensing agreement with DSW, Inc., a specialty footwear retailer, which expires in February 2019.  Pursuant to this agreement, DSW, Inc. operates a footwear business in the Debtors' stores, in exchange for the Debtors receiving a percentage of the net footwear sales.  During the fiscal year 2016, the Debtors received approximately $7.8 million in licensing revenue.  Although the Debtors' footwear departments are still staffed by their employees, the footwear operations are supported by operations personnel provided by DSW, Inc., which personnel work with the Debtors' employees and provide recommendations regarding merchandise presentation and other operations-related issues.  DSW, Inc. owns all footwear inventory sold in the Debtors' stores, which it ships directly to the Debtors, and has complete authority over all aspects of the merchandise procurement process.  From 2006 to 2016, the Debtors were parties to a similar licensing agreement for their maternity department.

### 4.    Leases

24.    The Debtors lease all of their store locations, corporate headquarters, and distribution centers, and do not own and real property.  The Debtors' store locations are typically around 50,000 square feet in size, and the Debtors lease approximately 70,000 square feet of office space in Omaha, Nebraska as their corporate headquarters, in addition to the two

KE 45939741.3

distribution centers mentioned above.  Many of the Debtors' store leases have a fixed rental payment due in advance and some leases contain tenant improvement allowances, rent holidays, rent escalation clauses, and/or contingent rent provisions, co-tenancy violation provisions, or minimum sales threshold provisions.

25.    The great majority of the Debtors' store leases include substantial leasehold improvement allowances, which cover construction and fixture costs for new store locations, and update and refurbishment costs for second generation leases.  In some instances, the Debtors are initially responsible for the construction costs for new stores, or refurbishment costs of second generation locations, and then are reimbursed for those expenses by the applicable landlord. When this situation occurs, the Debtors report the construction and refurbishment costs as capital expenditures, and report the subsequent landlord reimbursement as proceeds of a sale-leaseback transaction.  The Debtors estimate that, absent concessions from landlords, their aggregate, minimum occupancy costs will be approximately $68.9 million in fiscal year 2017.

### 5.    Customer Loyalty Program

26.    In May 2013, the Debtors introduced their customer loyalty program, gRewards, which currently has over 5.4 million members.  gRewards is a point-based program, where program members can earn points on qualifying purchases at a participating store location to earn reward certificates for a discount on future purchases.  Points accumulated under the gRewards program do not have any cash or other monetary value, and the Debtors retain all right, title, and interest, including property rights, in such points.  gRewards members' purchases account for approximately 70 percent of the Debtors' total sales.

### 6.    Private Label Credit Card

27.    The Debtors offer their customers a private label credit card (the "Gordmans Credit Card") through a third party, Alliance Data Systems ("ADS").  Gordmans Credit Card

holders earn special discounts, coupons, and reward points as benefits of being cardholders.

ADS approves all applications for the Gordmans Credit Card, collects all receivables for charges

made to the Gordmans Credit Card, bears all risk of loss associated with the credit extended to

cardholders, and receives all associated fees.    The Debtors recognize sales charged to the

Gordmans Credit Card at the point of sale in the same manner as all other credit cards.

## II.    The Debtors' Corporate and Capital Structure.

28.    The chart below depicts the Debtors' current corporate structure.    As set forth

below, each wholly-owned subsidiary of Gordmans Stores is a Debtor in these chapter 11 cases.



29.    As of the Petition Date, the Debtors' consolidated long-term debt obligations

totaled approximately $56.9 million, consisting of a revolving credit facility and term loan

facility.    Additionally, the Debtors have approximately $9.0 million in outstanding letters of

credit.    The primary components of the Debtors' consolidated funded debt obligations outstanding as of the Petition Date are described below. [5]

### A.    The Loan, Guaranty, and Security Agreement.

30.    On February 20, 2009, each of the Debtors entered into a loan, guaranty, and security agreement (together with all amendments, restatements, supplements, schedules, and exhibits, collectively, the "Loan Agreement") with Wells Fargo Bank, National Association ("Wells Fargo") as agent and lender, and certain other lender parties thereto from time to time. Under the Loan Agreement, Gordmans, Inc. is the sole borrower, and the other Debtors (Gordmans Stores, Gordmans Management Company, Inc., Gordmans Distribution Company, Inc., Gordmans Intermediate Holdings Corp., and Gordmans LLC) are each guarantors.    The Loan Agreement is comprised of two facilities, secured by substantially all of the Debtors' assets: a $100 million revolving credit facility (the "Revolving Credit Facility") and a $30 million term loan facility (the "Term Loan Facility").

### 1.    Revolving Credit Facility

31.    Historically, the Debtors' primary sources of funds for their business activities are operating cash and borrowings under the Revolving Credit Facility.    On September 2, 2016, the Debtors and Wells Fargo amended the Loan Agreement to increase the borrowing availability under the Revolving Credit Facility from $80 million to $100 million.    In connection with this amendment, Wells Fargo executed a revolving note for $68.75 million and PNC Bank, N.A. ("PNC") executed a revolving note for $31.25 million.    Obligations arising under the Revolving Credit Facility are secured by first-priority liens on the Debtors' inventory, accounts receivable, and other personal property, and a second priority lien on the Debtors' remaining assets,

---

[5]    This summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.

including real estate fixtures, equipment, intellectual property, books and records, permits, licenses, insurance. The Revolving Credit Facility matures on June 28, 2020. As of today, approximately $29.0 million remains outstanding under the Revolving Credit Facility.

### 2.   Term Loan Facility

32.   On June 29, 2015, the Loan Agreement was amended to provide the $30 million Term Loan Facility, with Wells Fargo loaning $15 million, Pathlight Capital LLC loaning $7.5 million, and Gordon Brothers Finance Company, LLC loaning $7.5 million. This facility replaced the Debtors' previous $45 million term loan facility entered into with Cerberus Business Finance, LLC on August 26, 2013. Obligations arising under the Term Loan Facility are secured by first-priority liens on the Debtors' real estate fixtures, equipment, intellectual property, books and records, permits, licenses, insurance, and a second priority lien on the Debtors' remaining assets, including the Debtors' inventory, accounts receivable, and other personal property.[6] The Term Loan Facility matures on June 28, 2020, with principal payments of $420,000 due quarterly and interest (LIBOR + 6.25 percent, with a LIBOR floor of 1.00 percent) due monthly. As of today, approximately $27.9 million remains outstanding under the Term Loan Facility.

### 3.   Letters of Credit

33.   Pursuant to the Loan Agreement, the Debtors may request letters of credit and stand-by letters of credit (collectively, "LCs") from Wells Fargo and PNC, as lenders under the Revolving Credit Facility. Issued LCs are reserved against the borrowing base under the Revolving Credit Facility, thereby reducing the funds available to the Debtors thereunder. The Debtors' obligation to repay Wells Fargo and PNC, as applicable, for drawn LCs, is secured by

---

[6]   Obligations arising under the Term Loan Facility are secured by a first priority lien on the Revolving Credit Facility's second-priority lien collateral, and vice versa.

the Debtors' interest in all cash, deposit accounts, and all proceeds of the foregoing.  In exchange for receiving the LCs, the Debtors:  (a) pay a fee equal to 1.25 percent to 2.00 percent of the daily balance of undrawn outstanding LCs; (b) pay a fronting fee upon the issuance of each LC equal to 0.125 percent per annum of the face amount of such LCs; (c) pay all customary commissions, fees, and charges then in effect imposed by PNC or Wells Fargo, as applicable; and (d) reimburse the expenses incurred by PNC or Wells Fargo in connection with such LCs.

34.     The Debtors typically utilize LCs to guarantee payment to merchandise vendors and to guarantee the Debtors' payment to contract counterparties.  As today, the Debtors have approximately 15 outstanding LCs, totaling approximately $9.0 million, primarily issued for the benefit of insurance companies, a utility provider, a landlord, and a factoring company.

### B.     The Debtors' Equity.

35.     As noted, on September 17, 2008, shareholders sold 100 percent of the outstanding stock of Gordmans Stores to Sun Capital.  On August 10, 2010, Gordmans Stores completed an initial public offering and began trading its common stock on the NASDAQ stock market, listed under the ticker symbol GMAN.  As of today, Sun Capital holds approximately 49.6 percent of Gordmans Stores' outstanding common stock, Brown Brothers Harriman & Co. holds approximately 12.9 percent, TD Ameritrade Clearing, Inc. holds approximately 6.6 percent, and National Financial Services holds approximately 5.6 percent.[7]   Otherwise, Gordmans Stores' equity owners are a diversified group of public investors, without a single entity owning or beneficially controlling more than 5 percent of Gordmans Stores' outstanding equity.

---

[7]     Other than Sun Capital, this information reflects holdings by nominees.

## Part II
## Events Leading to the Chapter 11 Cases

36.     A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These factors include the general downturn in the retail industry, which led to a decrease in sales and increased operating losses and the marked shift away from brick-and-mortar retail to online channels.

## I.     Challenging Operating Environment.

37.     The Debtors, and many other apparel-focused and retail companies, have faced a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet their sales and profitability targets.  The combination of the above factors, in addition to other factors plaguing the retail industry as a whole, contributed to the Debtors falling short of their targeted sales, profitability performance, and increasing operational losses.

38.     Despite their substantial brick-and-mortar footprint, the Debtors do not have a large online presence, and online sales, which account for an increasing proportion of retail spending, make up a relatively small portion of the Debtors' sales:  less than 1 percent over the past year.  The Debtors' lack of a fully-developed online presence has put downward pressure on the Debtors' revenue, and has hurt their comparative performance against competitors with more modern online-centric sales models.  The increase in online shopping and decrease in customer traffic industry-wide has particularly affected brick-and-mortar retailers, such as the Debtors, who maintain significant rent and payroll obligations to operate their brick-and-mortar stores, despite the decreasing sales in those locations.

KE 45939741.3

## II.      Supply Chain and Borrowing Base Challenges.

39.      As mentioned above, the challenging sales environment continued to affect the

retail industry, and caused the factoring and vendor community to continually tighten credit

terms. The Debtors' ability to obtain inventory depends on certain manufacturers' and vendors'

ability to obtain financing through factoring companies and, to the extent such vendors are

unable to secure sufficient credit from those factors, the Debtors may be unable to purchase

sufficient inventory.  Approximately half of the Debtors' inventory is purchased from vendors

that factor their receivables.  As mentioned above, increasing pressures in the retail industry

caused the factoring and vendor community to further tighten credit and, in February 2017,

factor and vendor credit was effectively shut off, causing the Debtors to purchase inventory on

shorter terms or even on a cash-on-delivery basis.  Among other things, this has reduced the

Debtors' liquidity (including by reducing the borrowing base under the Revolving Credit

Facility), creating a negative feedback loop.  Without the flow of fresh inventory, the Debtors'

retail business will not be sustainable.

40.      Additionally, due to the limited borrowing base availability under the Revolving

Credit Facility, prior to the Petition Date Wells Fargo swept all of the Debtors' available cash on

a daily basis.  This, combined with the Debtors' vendors' unwillingness or inability to ship new

inventory on credit, has limited the Debtors' ability to purchase new inventory.  As is typical in

the retail industry, the Debtors' inventory levels form a substantial portion of the borrowing base

under the Revolving Credit Facility; thus, the Debtors' inability to obtain new inventory only

exacerbates the Revolving Credit Facility borrowing base constraints.

## III.      Exploration of Strategic Alternatives.

41.      Recognizing the need to explore strategic alternatives, the Debtors retained D&P

in July 2016 to act as their financial advisor.  In connection with this process, D&P compiled

diligence information, prepared a confidential information memorandum (the "CIM"), and compiled a targeted list of strategic and financial buyers.

42.     In September 2016, in connection with this process and after failed negotiations with other interested parties, the Debtors and D&P contacted no less than 80 potentially interested parties, including 14 strategic parties and 70 financial parties.  By November 2016, approximately 34 parties entered into confidentiality agreements with the Debtors and received the CIM as to begin the diligence process and negotiations toward a transaction.

43.     Despite these efforts, and subsequent due diligence and discussions with potentially interested parties, this marketing process did not give rise to a viable transaction. From November 2016 through February 2017, D&P continued to work with the Debtors to explore several transaction structures to maximize value, in addition to maintaining contact with the potentially interested parties and preparing an updated CIM.  The Debtors' financial position continued to deteriorate.

44.     To preserve and maximize value, the Debtors again sought to implement a sale process, this time in connection with a chapter 11 filing, to concentrate its store base, rationalize its fixed costs, and emerge a more profitable platform.  Beginning March 1, 2017, the Debtors and D&P engaged in a significant marketing process to solicit bids for the Debtors' assets, and for the Debtors' business as a going concern.  By March 6, 2017, D&P contacted not less than 90 potentially interested parties, including 15 strategic parties and 77 financial parties.  Of these, approximately 38 parties entered into confidentiality agreements with the Debtors and received a copy of the updated CIM, and began the diligence process.

45.     Through this process, after vigorous marketing efforts and discussions with multiple potentially interested parties, the Debtors determined that the stalking horse liquidation

bid from the Stalking Horse Liquidator offered the Debtors the best alternative to maximize value for their estates and creditors.

46.     As of the date hereof, the Debtors entered into an agency agreement (the "Stalking Horse Agency Agreement") with the Stalking Horse Liquidator, which provides for the sale in liquidation of the inventory, fixtures and other assets of all or substantially all of the Debtors' retail stores and distribution centers as well as certain other assets of the Debtors. The Debtors seek approval of the Stalking Horse Agency Agreement, subject to a competitive process for potential higher or better bids.

47.     In connection with the Stalking Horse Agency Agreement, the Debtors have proposed bidding procedures pursuant to which they will conduct a process to solicit potentially higher or better bids.  The proposed bidding procedures include approval of the terms of the Stalking Horse Agency Agreement, including bid protections payable to the Stalking Horse Liquidator in the event the Agency Agreement is terminated under certain circumstances, consisting of (a) a break-up fee of $1.125 million, and (b) an expense reimbursement.  The terms of the Stalking Horse Agency Agreement were negotiated on an arm's-length basis between the Debtors and the Stalking Horse Liquidator, and each party's advisors, and were a necessary inducement for the Stalking Horse Liquidator to enter into the Stalking Horse Agency Agreement.

48.     The need to proceed swiftly cannot be overstated.  It is critical for the Debtors' preserving value for the benefit of their estates to consummate a liquidation, sale, or other asset disposition to monetize their assets as soon as possible.  To that end, the Debtors will propose an expedited schedule to obtain competing bids and approve an asset disposition.  More specifically, the Debtors will request to have a hearing to consider their proposed bidding

18

procedures, including the bid protections under the Stalking Horse Agency Agreement, on Friday, March 17, 2017. In addition, the Debtors' proposed bidding procedures set a hearing to approve an asset disposition transaction on or before March 23, 2017.

49.    Based on the Debtors' cash flow forecasts and the inventory valuation mechanics in the Stalking Horse Agency Agreement, even a one-week extension of this proposed timeline could result in over $3.9 million in lost value to the Debtors' estates (in the form of increased costs and lost sale proceeds). After discussions with our advisors, I believe that the Debtors will receive a substantial level of interest and may receive competing bids from interested parties in this timeframe and that the proposed bidding procedures may offer the Debtors a chance to increase the ultimate value provided by the monetization and disposition of their assets.

50.    In addition to preserving value, the Debtors must proceed quickly in an efficient matter to minimize the costs of the Debtors' chapter 11 cases and maximize and realize value as quickly as possible. Accordingly, the Debtors intend to swiftly proceed with a fair and efficient process to preserve and maximize value for enterprise-wide stakeholders.

## Part III
### First Day Motions[8]

51.    Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these chapter 11 cases seeking orders granting various forms of relief intended to enable them to efficiently administer their estates with minimal disruption and loss of value during the liquidation or other asset disposition process described herein. The Debtors request that the relief requested in each of the First Day Motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates. I believe that the relief requested in

---

[8]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

KE 45939741.3

the First Day Motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these chapter 11 cases. I have reviewed each of the First Day Motions discussed below, and the facts set forth in the First Day Motions are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

52.     The First Day Motions include:

- *Debtors' Motion for (I) Joint Administration of Chapter 11 Cases and (II) Related Relief*;

- *Debtors' Application For Authorization to Employ and Retain Epiq Bankruptcy Solutions, LLC as Notice, Claims, and Solicitation Agent, Effective Nunc Pro Tunc to the Petition Date*;

- *Debtors' Motion for (I) Authority to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Personal Information for Individual Creditors, (II) Approval of the Form and Manner of Notifying Creditors of the Commencement of These Chapter 11 Cases, (III) Waiver of the Requirements to File a List of and Provide Notices Directly to Equity Security Holders, and (IV) Related Relief*;

- *Debtors' Motion to (I) Authorize Postpetition Use of Cash Collateral, (II) Grant Adequate Protection to Prepetition Lenders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 507 and Bankruptcy Rules 2002, 4001, and 9014, (III) Modify the Automatic Stay, (IV) Schedule a Final Hearing Pursuant to Bankruptcy Rules 4001(b), and (V) Grant Related Relief*;

- *Debtors' Motion for Authority to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue Intercompany Transactions*;

- *Debtors' Motion for (I) Authority to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Related Relief*;

- *Debtors' Motion for (I) Authority to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Related Relief*;

- *Debtors' Motion for Authorization to Pay Certain Prepetition Claims of Lien Claimants*;

- *Debtors' Motion for (I) Authority, But Not Direction, to Pay Certain Prepetition Taxes and Fees and (II) Related Relief*;

- *Debtors' Motion for Authority to (I) Pay Obligations Under Insurance Policies Entered Into Prepetition, (II) Continue to Pay Brokerage Fees, (III) Renew, Supplement, Modify, or Purchase Insurance Coverage, (IV) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (V) Enter Into New Financing Agreements in the Ordinary Course of Business*; and

- *Debtors' Motion for (I) Approval of Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect To Common Stock and (II) Related Relief.*

53.     The First Day Motions seek authority to, among other things, use cash collateral and grant prepetition lenders adequate protection on an interim basis, honor employee-related wages and benefits obligations, preserve client and customer relationships, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is necessary to giving the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' stakeholders.

54.     Several of the First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate an irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.

55.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I

KE 45939741.3

believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors

to operate in chapter 11 with minimal disruption to their business operations and constitutes a

critical element in successfully restructuring the Debtors' businesses.


[*Remainder of page intentionally left blank*]

KE 45939741.3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 12, 2017

/s/ _____
James B. Brown
Gordmans Stores, Inc.
Chief Financial Officer and Executive Vice President