IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.  BK 17-80304 |
| | ) | (Chapter 11 - Jointly Administered) |
| GORDMANS STORES, INC. *et al* | ) | |
| | ) | |
| Debtors. | ) | |

## REQUEST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. §§ 365(d)(3), 503(a) AND 503(b)(1)(A)

Wolf Creek Center, LLC ("Landlord"), by and through its undersigned counsel, hereby requests payment of an administrative expense claim against the above-captioned debtors (the "Debtors") in the amount of **$43,691.40**, pursuant to sections 365(d)(3), and/or 503(b)(1)(A) and 507(a)(2) of Title 11 of the United States Code (the "Bankruptcy Code").  In support of its Request, Landlord shows the Court as follows:

### BACKGROUND

1.      On March 13, 2017 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

2.      The Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.      On May 5, 2017, the Court entered an Order (Filing No. 428) establishing an administrative claim bar date of June 5, 2017, at 4:00 P.M.

4.      Landlord and Debtor Gordmans, Inc. were parties to a lease of non-residential real property (as amended from time to time, the "Lease") for premises located at 10515 S. 15th Street, Bellevue, Nebraska (the "Premises").  A true and correct copy of the Lease is attached hereto as **Exhibit A**.

5.      As of the date of this filing, Debtors have neither assumed nor rejected the Lease.

6.      From the Petition Date through May 22, 2017, during the period of Debtors ongoing occupancy and use of the Premises, Debtors accrued rent and common area maintenance charges in the amount of $43,691.40, representing twenty-two (22) days of pro-rated rent from May 1st, 2017 to May 22, 2017.

7.      Landlord is entitled to an administrative expense claim for the stub rent because

it was incurred by Debtors and preserved the Debtors' estates.  The Premises are the location of Debtors' corporate headquarters.  The use and occupancy of such headquarters throughout the period of Debtors' wind down and going out of business sales have benefitted Debtors and Debtors' estates.

## **RELIEF REQUESTED**

8.     By this Application, Landlord requests allowance and immediate payment of $43,691.40 for the stub rent, which amount arose under the Lease and was due subsequent to the Petition Date pursuant to Bankruptcy Code Sections 365(d)(3), 503(a), 503(b)(1)(A), and 507(a)(2).

9.     At all times after the Petition Date, Debtors have continued to Lease the Premises from Landlord pursuant to the Lease, until May 22, 2017.

10.     Pursuant to Bankruptcy Code Section 365(d)(3), Debtors were required to satisfy the amounts owed as described above.

11.     Debtors have failed to pay the amounts owed pursuant to the stub rent.  Landlord is entitled to allowance and immediate payment of its administrative expense claim under the Lease, pursuant to pursuant to Bankruptcy Code Sections 365(d)(3), 503(a), 503(b)(1)(A), and 507(a)(2), in the total amount of **$43,691.40.**

DATED this 5th day of June, 2017.

**WOLF CREEK CENTER, LLC**

By:/s/ Mark J. LaPuzza_____
    Mark J. LaPuzza, #22677
    Pansing Hogan Ernst & Bachman, LLP
    10250 Regency Circle, Suite 300
    Omaha, Nebraska  68114
    (402) 397-5500
    mjlbr@pheblaw.com
    ITS ATTORNEYS

## NOTICE PURSUANT TO NEBRASKA BANKRUPTCY RULE 9013-1

On June 5, 2017, Wolf Creek Center, LLC filed its Application for Administrative Expense Claim pursuant to 11 U.S.C. 503(b)(9) (the "Application") with this Court.

You are hereby notified that any objections or requests for hearing (collectively "Objections") to the Application must be filed and served on or before June 26, 2017.

If no Objection is timely filed and served on the undersigned on or before June 26, 2017, the United States Bankruptcy Court for the District of Nebraska may enter an Order on the Application without further notice of hearing. If an Objection is timely filed and served, a hearing will be scheduled by the Court on the Application and any Objections thereto.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 5th day of June, 2017, a copy of the foregoing was filed electronically. Notice of this filing was through the Court's Electronic Case Filing System. Parties may access this filing through the Court's system.

Brad Weiland
Jamie R. Netznik
Kirkland & Ellis LLP 300
North LaSalle
Chicago, IL 60654
Email: brad.weiland@kirkland.com;
Jamie.netznik@kirkland.com *Counsel to the Debtors*

Jeffrey T. Wegner Lisa M.
Peters Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102
Email: lisa.peters@kutakrock.com;
Jeffrey.wegner@kutakrock.com
*Co-Counsel to the Debtors*

Jerry L. Jensen
Office of the United States Trustee
111 South 18th Plaza, Suite 1148
Omaha, NE 68102
Email: Jerry.L.Jensen@usdoj.gov
*U.S. Trustee*

Ronald E. Gold
Douglas L. Lutz
Frost Brown Todd LLC 301
East Fourth Street Cincinnati,
OH 45202
Email: rgold@fbtlaw.com; dlutz@fbtlaw.com
*Counsel to Unsecured Creditors Committee*

Brian J. Koenig
Koley Jessen P.C., L.L.O.
One Pacific Place
1125 South 103rd Street, Suite 800
Omaha, NE 68124
Email: brian.koenig@koleyjessen.com
*Counsel to Unsecured Creditors Committee*

Russell A. Westerhold #22498
FRASER STRYKER PC, LLO
409 S. 17th Street
500 Energy Plaza
Omaha, Nebraska 68102
(402) 341-6000
rwesterhold@fraserstryker.com

Dated:  June 5, 2017

/s/ Mark J. LaPuzza

# LEASE

EXHIBIT A

This Lease, made and entered into this 17th day of June, 2002, by and between

> MIKE HOGAN DEVELOPMENT COMPANY, INC.,
> a Nebraska corporation
> with offices at
> 818 Tara Plaza
> Papillion, Nebraska 68046,

hereinafter called the "Owner", and

> Gordmans, Inc.
> (d/b/a Gordmans)
> a Nebraska corporation
> with offices at
> 12100 West Center Road
> Omaha, Nebraska 68144

hereinafter called the "Tenant",

WITNESSETH: That,

The Owner does hereby lease, demise and let unto the Tenant the following described premises:

Space No.:                          150

Bellevue Mailing Address:           Space No. 150
                                    Wolf Creek Plaza
                                    Bellevue, Nebraska 68005

Said space is to be located in Wolf Creek Plaza as shown on EXHIBIT A and will contain approximately 50,000 [handwritten: 51,000] square feet of floor area determined by measuring from the outside of non-party walls and to the middle of party walls. EXHIBIT A is attached hereto and incorporated herein by this reference. Upon construction of the demised premises Owner's architect and Tenant's architect shall confirm the actual square footage of the demised premises and Owner and Tenant agree to execute a written amendment to this lease reflecting such actual square footage as so measured. Tenant's rent and charges in accordance with this lease shall be proportionately adjusted in the event the actual square footage of the demised premises differs from the square footage identified above.

In addition to the above described premises, Tenant shall, subject to control and reasonable regulation by Owner, enjoy the nonexclusive use of all common area parking areas, access roads and sidewalks furnished by Owner, ~~provided Owner shall have the right to locate kiosks, fountains, planters, pools, sculptures, vending machines, strollers, telephones, benches and similar items within such common areas.~~

Owner represents to Tenant that it will construct, at its expense, the parking areas and building areas shown on the Exhibit A site plan, including all necessary grading, utility work, parking lot lighting and landscaping.

Said premises are a portion of a development known as WOLF CREEK PLAZA, Bellevue, Nebraska.

The term of this lease is ten (10) years commencing ~~on the beginning day of the lease year as hereinafter described and~~ October 1, 2003 ending at 12 o'clock midnight on ~~the last day of the lease year ten years, two months (10 years 2 months) later.~~ September 30th, 2013.


INITIALS

1

The terms and conditions of this lease are as follows:

1.  CONSTRUCTION.
The demised premises are hereby leased to Tenant as now constructed provided Owner shall complete that work described as "Owner's Additional Work" in EXHIBIT A attached hereto and by this reference made a part hereof.

> lease Section 38 hereinafter and deliver the demised premises to Tenant on or before May 1, 2003.
> Owner will complete the work listed on page one of this lease prior to Tenant opening for business.

2.  RENT BEGINNING DATE.

> no less than two (2) weeks prior to

If Owner is to complete any additional work in accordance with Section 1 above, it shall give Tenant written notice when it has substantially completed such work. When the Owner gives such written notice of substantial completion and prior

> Prior

to Tenant's occupancy for any finishing, fixturing, or stocking, Tenant shall arrange for its utilities and insurance coverage. and execute and deliver to Owner an Acceptance of Space, which Acceptance may be subject to a punch-list of remaining Owner work items, if any, within the demised premises. If no additional work is to be completed by Owner in accordance with Section 1, Tenant hereby acknowledges acceptance of the demised premises upon delivery of same by Owner and agrees to arrange for its utilities and insurance coverage prior to occupancy of the premises.

Rent for said space shall begin whichever is earlier: (A) Two (2) months after the Tenant opens for business, or (B) One hundred and fifty (150) days after delivery of the demised premises by Owner after substantial completion of "Owner's Work" in lease Section 1 and 44 hereinafter.  October 1, 2003

After rent beginning has been established, time shall be of essence for the performance of this lease.

LEASE YEAR.
The beginning day of the rent shall establish the beginning of each lease year; and the term of this lease shall run from that day forth provided, however, that if the rent beginning date shall fall on any day other than the first day of the month Tenant shall pay appropriately apportioned rent for such partial month and the first day of the month next following shall be the beginning day of the first lease year.

OCCUPANCY CONDITIONS.
Tenant shall not enter into occupancy of the demised premises until delivery of same by Owner, provided, if Owner is to complete any additional work in accordance with Section 1, then, with written permission from the Owner and providing Tenant assumes responsibility for any damage done to the development, the Tenant may enter said premises for purposes of fixturing and preparation for occupancy prior to completion of the Owner's additional work.  Tenant agrees to withdraw or replace any of its workmen or contractors who in the opinion of the Owner may cause strikes, work stoppage or picketing of said development. Tenant's property kept, stored or maintained in the demised premises shall be kept, stored or maintained at the risk of the Tenant.

> reasonable

> on or before the later of 120 days after Owner delivery in accordance with lease Section 1 above or August 1, 2003

TENANT TO OPEN.
Without the Owner waiving any rights contained elsewhere herein, if the Tenant fails to open the demised premises for business within  one hundred twenty (120)  days after  delivery , then Tenant shall, in addition to the guaranteed minimum rental hereinafter provided, pay the Owner an additional rent at the rate of   $500.00  per day for each day until open for business. ; said additional rental shall be in lieu of any percentage rent that might have been earned during such period of the Tenant's failure to open.

3.  LEASE CONSIDERATION.
The consideration for this lease is the mutual covenants of the parties.  As partial consideration for this lease and whenever requested by the Owner, the Tenant agrees to promptly furnish to the Owner not more than once each year a signed current financial statement accurately reflecting the Tenant's financial condition.  As consideration for the preparation of this lease, the Tenant has delivered to the Owner the sum of $         .Tenant and Owner agree that upon the execution of this lease by both parties said lease preparation fee will be applied to the first rental due hereunder.  Tenant and Owner further agree that if this lease is not executed by Tenant said fee will be retained by the Owner for such preparation services and if this lease is not executed by Owner said fee will be refunded to Tenant.

2

4.   **RENT.**

Tenant shall and hereby agrees to pay to the Owner without demand, deduction, or setoff, at such place or places as the Owner may designate from time to time in writing, rent in advance for said premises as follows:

*$497,250.00*                                                    *$41,437.50*

First through fifth lease years:           $~~487,500.00~~ each lease year, payable $~~40,625.00~~ each month
(computed at an annual rental rate of $9.75 per square foot of
~~demised area)~~

TWO     On page 3, Section 4, delete the typed in rental provisions and substitute in lieu thereof the following:

"First through fifth lease years:     $497,250.00 each lease year, payable $41,437.50 each month.

Sixth through tenth lease years:     $548,250.00 each lease year, payable $45,687.50 each month."

~~For periods of less than a full lease year, percentage rental, if any, shall be considered to be earned each day. No portion of the rent paid by Tenant after the expiration of any period during which rent is abated shall be allocated by Owner or Tenant to such abatement period, nor is any rent intended by the parties to be allocable to any abatement period or to any period other than that specified herein.~~

In addition to all of the rental set hereinabove, the Tenant shall pay any tax which any governmental authority (acting under any present or future law) may levy, assess, or impose upon the rent reserved hereunder. Said tax, if any, shall be paid not less than three (3) days before same is due and payable; provided, that Tenant shall not be required to pay any inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax or capital levy that is or may be imposed upon Owner.

5.   **MAINTENANCE OF COMMON AREAS.**

Owner shall operate and maintain common areas and common facilities of the development. Tenant shall pay upon demand in addition to the rent a proportionate share of costs of operating and maintaining common areas and common facilities. Common areas and common facilities include without limitation all parking areas, access roads, sidewalks, ~~malls, rest rooms,~~ landscaped space and any other space used in common or available for use by the Tenant, the Tenant's customers, employees, agents, servants or other invitees of the Tenant. Operation and maintenance shall include, but not be limited to, ~~real estate taxes assessed on the land under and the improvements upon all common areas and facilities,~~ personal property taxes assessed upon maintenance supplies and equipment, costs of defending and preserving common areas and facilities, costs of insurance secured with respect to common areas pursuant to Section 14, ~~losses attributable to operation of common areas and facilities,~~ lighting, ~~heating and cooling at the rate set forth in Section 19,~~ water, sewer use fees, cleaning, maintenance equipment, snow removal, line repainting, policing and security, repairs, ~~replacements,~~ the cost of labor and personnel to implement such services, management fees and costs relating to the development, and everyday maintenance of all areas and facilities provided by the Owner for the common use and benefit of the occupants of the development. ~~As an addition to the foregoing and as part of the costs to be paid by the Tenant for operation and maintenance of common areas and common facilities, fifteen percent (15%) shall be added to the total to cover administration.~~ Apportionment of these costs shall be made on the basis of square feet of floor area herein demised to Tenant as related to the total square feet of rented and/or occupied floor area in the development; provided, ~~"rented and or occupied floor area" shall not at any time be considered to be less than 90% of rentable floor area.~~

rentable

(which shall not exceed 4% of all rents collected at the development).

(Continued on Page 14)

6.   **USE.**

Tenant shall use, occupy, and operate the demised premises. Premises shall be used, occupied, and operated only ~~for~~

as a "Gordmans" retail store for the sale to the general public of name brand apparel merchandise for men, women, and children as is also offered by Tenant for sale in its other Nebraska, Missouri, and Iowa "Gordmans" retail locations, and for the incidental sale of directly related items thereto; provided, tenant may change use of the demised premises as follows:

(Continued on Page 14)

Except for a going out of business sale conducted during the final sixty (60) days of lease term, no

Tenant agrees to conduct its business at all times in a responsible and reputable manner. The Tenant shall promptly comply with all laws affecting the premises hereby leased and the cleanliness, safety, occupation and use of same. ~~No~~ sale for purpose of closing the store, auction, fire or bankruptcy sales may be conducted in the demised premises without previous written consent of the Owner. In the event that the Tenant uses the demised premises for the storage or sale of odorous materials or products and such odor is detectable ~~in the corridors, malls, or~~ other rental areas, the Tenant shall forthwith and not later than ten (10) days after written request from the Owner either remove and forego the storage and/or sale of said materials or products or ventilate the premises at its expense with a ventilation system satisfactory to the Owner. Tenant shall not use the sidewalks or parking areas ~~or mall area~~ adjacent to the demised premises for business purposes except that Tenant is permitted to conduct sidewalk sales four (4) times per year for no more than three (3) days per sale; provided, Tenant will notify Owner in writing at least fourteen (14) days prior to each sidewalk sale and such sidewalk sales may only be conducted directly in front of the demised premises and so as not to disrupt neighboring businesses or impede pedestrian traffic to and from neighboring businesses.

3

those hours typical to all other Gordmans retail locations in Nebraska, Missouri, and Iowa.

**STORE HOURS**
Except for special permission in writing from the Owner, the Tenant agrees to keep the demised premises open and operating no less than ~~nine (9) hours per day Monday through Saturday and no less than five (5) hours per day on Sunday and all such additional hours as the Tenant may elect provided, however, Tenant shall not be required to be open on national holidays and Owner shall not be required to open or operate the common areas or mechanical systems of the center prior to 7:00 a.m. or after 10:00 p.m. of any day.~~

**CONTINUOUS OPERATION.**
or remodeling.
The Tenant agrees that its continuous and effective operation during the term hereof is partial consideration for this lease and is essential for the success of the development; and except for reasons of fire, other casualty, or taking of inventory, Tenant agrees to operate the demised premises during the store hours delineated hereinabove. ~~In the event Tenant vacates, abandons, deserts, ceases its operation in the demised premises, or otherwise violates this agreement to effectively operate, then without the Owner waiving any rights contained in this lease, Tenant agrees that during the period of such violation, in addition to paying all other charges due under this lease, it shall pay rent to the Owner at a prorated daily rate of two (2) times the last periodic rental rate specified in Section 4 of this lease, such amount to be construed as liquidated damages to Owner caused by Tenant's failure to operate in strict accordance herewith.~~

7. **MECHANIC'S AND OTHER LIENS.**
Tenant shall not permit any mechanic's, laborer's or materialman's lien to stand against the demised premises for any labor or material furnished to Tenant or claimed to have been furnished to Tenant in connection with work of any character performed or claimed to have been performed on said premises by or at the direction of Tenant. Tenant shall promptly pay all contractors and materialmen, so as to minimize the possibility of a lien attaching to the demised premises and should any such lien be made or filed, Tenant shall bond against or discharge the same within ten (10) days after written request by Owner.

8. **MAINTENANCE AND CARE OF PREMISES.**
working    (including without limitation common walls)
The Owner shall keep the foundation, the exterior of the load-bearing outer walls and roofing of the building in good repair, except that the Owner shall not be called on to make any such repairs occasioned by any act or omission of the Tenant, its agents or employees or customers. The Owner shall not be called upon to make any other improvements, repairs or replacements of any kind upon said premises; and, at the sole cost and expense of the Tenant, said premises shall at all times be kept in good order, condition and repair by the Tenant, and shall also be kept in a clean, sanitary and safe condition and in accordance with all directions, rules and regulations of the health officer, fire marshal, building inspector or other proper officers of the governmental agencies having jurisdiction. The Tenant shall at its own expense maintain, repair or replace any glass windows, show windows and doors in or enclosing the demised premises. Tenant shall clean and maintain the interior and exterior of its store front and its signs and its show window, if any, and shall at all times keep its show windows and glass doors in a neat and clean condition.
subject to normal wear and tear or casualty

**AT EXPIRATION.**
working    (excluding carpeting)
At the expiration of this lease, all leasehold improvements and fixtures attached to the walls, floors, or ceiling, whether installed by the Tenant or the Owner, shall at the option of the Owner be considered a part of the building and remain in the demised premises as a part of the realty. Tenant shall surrender the premises in good condition, reasonable ~~wear and tear~~ excepted. Tenant agrees to remove all of its signs of identification at expiration of this lease and to restore the surface to which they attached.
wear, tear, or casualty
(other than moveable trade fixtures and graphics identifying Tenant's business)

9. **SIGNS AND CONSTRUCTION BY TENANT.**
The Tenant agrees to provide signs of identification outside of its demised premises, which signs shall be installed prior to Tenant's opening for business. Drawings and descriptions of such signs shall be submitted to Owner. Signs shall not be installed until Tenant has received Owner's written approval, which shall not be unreasonably withheld or delayed. Owner hereby approves signs substantially in the form typical to all other Gordmans' retail locations in Nebraska, Missouri, and Iowa; provided, such signs conform to all applicable governmental rules and regulations. Tenant agrees to maintain its signs in an attractive and safe condition. Tenant shall obtain any permits or bonds for signs required by governmental regulations. The Tenant agrees not to use any media in the demised premises that shall be deemed objectionable by the Owner, such as loudspeakers, phonographs, radio broadcasts, speakers, amplifiers, or flashing lights in a manner to be heard or otherwise distracting outside the demised premises. The Tenant shall not install any plumbing fixtures, exterior lighting fixtures, shades or awnings or any exterior decorations or paintings or use any flammable materials above the finished ceiling line of the demised premises or build any fences, paint, drill, attach to or make any change to the store front, entrances, exterior walls, exterior signs of identification, marquees, roof or abutting sidewalks or attach any temporary or permanent signs, advertisements, displays, or prices to its show windows and/or store front glass without previous written consent of the Owner, such consent shall not be unreasonably withheld or delayed. Tenant shall not ~~repartition or otherwise remodel or~~ make any structural changes in the demised premises without the written consent of the Owner, such consent not to be unreasonably withheld or delayed.

INITIALS

4

Nonstructural changes may be made to interior of demised premises without Owner consent.

Owner has erected a Wolf Creek Plaza project identification pylon sign. Such pylon sign includes four (4) equally sized Tenant sign panels thereon. Tenant will be permitted, at its expense, to use the top panel to identify "Gordmans"; additionally, Tenant shall have the right, at its expense, to enlarge the top sign panel subject to Owner's prior written approval of the resultant affect on the overall appearance of the pylon sign, such approval not to be unreasonably withheld. Tenant shall have the right to install antennas and satellite dishes at its expense on the roof of the demised premises subject to reasonable Owner approval as to location (not to be visible from the customer parking area) and size and provided Tenant removes all antennas and satellite dishes on or before lease termination or expiration and repairs all damage to the roof caused thereby.

**10.    COVENANT TO HOLD HARMLESS.**    *or merge the top 2 panels*

Owner and Tenant agree to indemnify each other against and to hold each other harmless from any and all claims or demands of any third party arising from or based upon any alleged act, omission, or negligence of the indemnifying party or its contractors, concessionaires, licensees, agents, servant, invitees, employees, or anyone else for whom the indemnifying party may be or alleged to be responsible, provided, however, that neither party shall be indemnified for the negligence or willful misconduct of itself or its officers, employees or agents. In the event that either party shall without fault on its part be made a party to any litigation commenced by any third party against the other party, then such other party shall protect and hold the party without fault harmless from and with respect to such litigation, and shall pay all costs, expenses, and reasonable attorney's fees incurred or paid by the party without fault in connection with such litigation, together with any judgments rendered against the party without fault.

**11.    INSURANCE.**    and Owner as an additional insured

Tenant at all times during the term of this lease shall at its expense provide and maintain with respect to the demised premises (a) comprehensive general public liability insurance on an occurrence basis in form customarily written for protection of tenants and owners, insuring Tenant and Owner as the named insured and providing coverage of not less than One Million Dollars ($1,000,000), single limit, for injuries to any one person, for injuries to persons in any one occurrence and for damage to property, provided, such minimum of insurance coverage shall not limit Tenant's liability under Section 13 hereinabove; (b) plate glass insurance covering all show windows, plate glass, and/or glass entrance doors in its demised premises; and, (c) casualty insurance against fire, vandalism, malicious mischief, sprinkler leakage if applicable, and such other perils as are from time to time included in a standard extended coverage endorsement, or such broader form of coverage as Tenant may select, insuring all alterations, additions or other improvements made by Tenant to the demised premises at any time, in an amount sufficient to replace them. ~~Such casualty insurance shall be issued in the name and for the benefit of Tenant and Owner as their respective interests may appear.~~ Proceeds received from such insurance shall be used to repair or replace the insured improvements in accordance with Tenant's obligation in Section 21 of this lease to standards of construction and quality of materials which are not less than equal to the prior standards and qualities provided, however, in the event the Owner elects to terminate this lease in accordance with Section 21 hereof, the full amount of such proceeds shall be paid to the Owner and the Tenant shall be released from its obligation to restore such improvements. Tenant shall provide Owner with ~~current duplicate policy or policies~~ of all such insurance required of Tenant, which policy or policies shall include an endorsement that the insurance company or companies cannot amend or cancel such insurance policy or policies without giving ten (10) days' prior written notice to the Owner.
certificates

All fixtures, inventories, improvements, equipment or other property kept, stored or maintained in the demised premises shall be so kept, stored or maintained at the risk of the Tenant only.

Owner at all times during the term of this lease shall secure with respect to the parking area and other common areas of said development (a) comprehensive general public liability insurance providing coverage of not less than One Million Dollars ($1,000,000), single limit, for injuries to any one person, for injuries to persons in any one occurrence and for damage to property, and (b) such other insurance as Owner shall deem necessary for the parking areas, common areas or for equipment used in common areas of the development. The cost of insurance secured by Owner with respect to this paragraph shall be prorated as a common area cost in accordance with Section 8 of this lease. Tenant will be named as an additional insured.

Owner at all times during the term of this lease shall secure with respect to the development, (a) casualty insurance against fire, vandalism, malicious mischief and such other perils as are from time to time included in a standard extended coverage endorsement, or such broader form of coverage as Owner may select, insuring the insurable building improvements constructed, or required under the terms of this lease to be constructed, by Owner, (b) sprinkler leakage insurance, if applicable, and (c) loss of rents insurance. Tenant shall be liable for and shall pay Owner each month, in advance, a pro rata share of the premium cost for such insurance secured by Owner, which monthly pro rata share shall be 1/12 of the product obtained by multiplying the annual cost of the premiums for such insurance by a fraction, the numerator of which shall be the floor area of the demised premises and the denominator of which shall be the total rentable floor area in the development on the first day of the applicable month, excluding rentable floor area in any portion of the development which is separately insured or for which premium thereon is excluded from the costs allocated hereunder. Insurance secured by Owner may bear a loss payable endorsement to protect any mortgagee's interest. Proceeds received from such insurance shall be used for rebuilding in accordance with Owner's obligation in Section 21 of this lease. Nothing in this section shall require Owner to insure the fixtures, inventories, improvements, equipment or other property of Tenant or any other occupant of the development.



5

Tenant agrees to pay any increase in rates for insurance that may at any time from and after the rent beginning date be charged to the Owner resulting from Tenant's extra-hazardous use or occupancy of the demised premises or the development whether or not Owner has consented to same. Tenant agrees to maintain in operation and connected to a monitoring system any sprinkler, smoke detection, or heat or fire prevention or detection device or system located within the demised premises provided that the sprinkler controls for the demised premises are controlled by Tenant.

12.  **ABUSE OF UTILITY SERVICES.**
The plumbing facilities shall not be used for any purpose other than that purpose for which they are constructed, and no foreign substance of any kind shall be thrown therein. The expense of any stoppage, breakage or damage resulting from a violation of this provision shall be borne by the Tenant causing same. If the Tenant installs any equipment that overloads utility lines to or in the demised premises, the Tenant shall at its own expense remove the overload or increase the capacity of such lines and make whatever changes are necessary to comply with the requirements of the Owner, insurance underwriters and governmental authorities having jurisdiction.

reasonable

13.  **PARKING OF EMPLOYEES' CARS.**
The Tenant and its employees may at their own risk park their motor vehicles on the development property but only in the areas specifically designated by Owner for that purpose; ~~Once each year Tenant further agrees to furnish to Owner, upon Owner's request therefor, the license numbers assigned to its motor vehicles and the motor vehicles of its employees. Tenant agrees to pay to the Owner costs, if any, incurred in the enforcement of parking rules providing such violations and such costs are attributable to a violation by Tenant, Tenant's subleases, agents, or Tenant's employees.~~ provided, Owner's parking requirements will be uniformly and fairly administered.

14.  **ASSIGNMENT AND VOTING CONTROL.**
The Tenant agrees that it will not assign or in any manner transfer this lease or any part thereof or any interest or estate therein without the previous written consent of the Owner, nor shall the Tenant sublet the demised premises or any part thereof without the previous written consent of Owner, nor shall the Tenant assign this lease to a corporation owned wholly or in part by the Tenant, nor the Tenant enter into any management contract or other relationship whereby the Tenant or its employees are in less than direct and immediate management of the demised premises and the business operated therein without the previous written consent of the Owner. Owner may accept rent or other payments due under this lease from any person, corporation, or partnership offering to pay same; and such acceptance by Owner shall not be construed to be an acceptance of such payor as Tenant hereunder nor as a consent or waiver of consent of any of the Owner's rights in this section. Owner consents required in this paragraph will not be unreasonably withheld or delayed.

control

If Tenant is a corporation and if at any time during the lease term the person or persons who own a majority of its voting shares at the time of the execution of this lease cease to ~~own~~ a majority of such shares (except as the result of transfers by gift, bequest, or inheritance) such transfer shall be deemed an assignment. Notwithstanding the forgoing, an initial public offering of stock in Tenant shall not be deemed an assignment.

Notwithstanding anything to the contrary set forth in this Section 14, in the event Tenant intends to assign this lease to a national retail tenant who at the time of such assignment has a tangible net worth in excess of Twenty Million Dollars ($20,000,000.00), calculated in accordance with generally accepted accounting principals, and such use of the Assignee for the demised premises is commonly found in first-class shopping centers, (and is not a second-hand store, odd lot, closeout and/or liquidation store, and does not violate any exclusive use provision of any tenant in the shopping center) then Owner shall either approve the assignment or either cancel this Lease upon sixty (60) days' written notice to Tenant.

Notwithstanding anything to the contrary set forth hereinabove, in the event Tenant merges with another entity or is acquired by another entity, such merger or acquisition shall not be deemed an assignment of this Lease.

Notwithstanding anything to the contrary set forth hereinabove, occupancy of a portion of the demised Premises by licensees of Tenant shall not be deemed an assignment or sublease of this Lease.

15.  **ACCESS TO PREMISES.**
upon reasonable advance notice to Tenant
The Owner shall have the right to enter upon the demised premises at all reasonable hours for the purpose of inspecting the same or adding or rerouting pipes, sprinkler systems, smoke detection systems, heat or fire detection systems or equipment, conduits or drains to serve the demised premises or premises other than the demised premises or for making repairs, additions or alterations, provided such adding or rerouting shall be handled so as to interfere as little as possible with the Tenant's use of the premises and Owner shall repair any damage caused by such work. The exercise of said right by Owner shall not give rise to any claim by Tenant for damages, and Tenant expressly waives any such claim or claims. If ~~the Owner deems~~ any repairs are required by the provisions of this lease to be made by the Tenant, Owner ~~necessary (it)~~ may demand that the Tenant make the same forthwith.

6 months

For a period commencing ~~one~~ year prior to the termination of this lease, the Owner may have reasonable access to the premises herein demised for the purpose of exhibiting the same to prospective tenants.

6

INITIALS

16. **UTILITIES.**

The Owner agrees to provide ~~the existing~~ mains and conduits to the demised premises in order that ~~the existing~~ utilities may be supplied, provided Owner shall not be responsible for Tenant's telephone service lines. As an additional charge, the Tenant shall pay for all utilities including water, sewer use, gas, and electricity used in the demised premises.

**HEATING AND COOLING.** _____

Tenant shall maintain all heating and cooling equipment serving only the demised premises in working condition, reasonable wear, tear and casualty excepted.

The Owner shall not be liable in damages or otherwise for any failure or defect in the furnishing of any of the above utilities, heating or cooling, or for any interruption due to civil insurrection, war, fire, accident, strike, riot, act of God, the making of necessary repairs or improvements, or any other causes beyond the control of the Owner; provided Owner shall use its best efforts to make any necessary repairs or improvements during hours that Tenant's business in the demised premises is not open to the public.

so that Owner is not in compliance with Section 28 of this lease

17. **CONDEMNATION.**    5,000 sq ft

If the whole of the demised premises or the parking area in said shopping center shall be taken under the power of eminent domain by any public or quasi-public authority, this lease shall terminate and expire as of the date of such taking, and rent and any other payments shall be paid and adjusted as of such date, and Owner and Tenant shall be released from any further liability hereunder. If ~~twenty percent (20%)~~ or more of the area of the demised premises shall be taken or condemned for public use or if ~~fifty percent (50%) or more~~ of the total parking area in said development shall be taken or condemned for public use and the Owner does not promptly begin the construction of substituted parking replacing at least the majority of the parking area so taken using double decking, contiguous land, or underground areas, then either Tenant or Owner may cancel and terminate this lease by serving upon the other party a written notice of its intention to cancel within thirty (30) days after the condemnation judgment shall be entered. In the event that such option to terminate is exercised, rent and any other payments shall be prorated to the date of taking and Owner and Tenant shall be released of further liability hereunder. If any portion of the demised premises is taken for public use and if neither party exercises its option to terminate this lease as permitted in this section above, then the minimum guaranteed rental provided for under Section 4 shall be reduced as of the date of taking in the proportion which the actual floor area taken bears to all of the floor area demised and the Owner shall promptly repair, restore, or rebuild for occupancy by Tenant the portion not so taken. If, during the repair, restoration, or rebuilding required, the demised premises are not usable in the opinion of either the Owner or Tenant, then the Owner or its contractors shall temporarily have possession and the minimum guaranteed rental shall be abated during the period of repair, restoration, or rebuilding.

and all other amounts payable hereunder from Tenant to Owner

All damages awarded or other sums or awards paid on account of any condemnation or taking under the power of eminent domain of the demised premises, the parking areas, the common facilities or the development, or any portion or portions thereof, shall belong to and be the sole property of Owner where such damages or other sums are awarded as compensation for loss or diminution in value of the leasehold, or for the fee of the demised premises, or otherwise; and in no event shall Tenant have any claim whatsoever against Owner or the condemning authority for loss or diminution in value of the leasehold or for the value of any unexpired term of this lease, Tenant hereby expressly waiving any such right or claim, provided, however, Tenant shall be entitled to any ~~award or portion thereof made for or on account of an~~ loss or cost to which Tenant ~~might be put in removing Tenant's merchandise, fixtures, equipment or furnishings and/or for any loss or damage to the same;~~

make claim with the condemning authority for

and                                                                                   incurred by

18. **DESTRUCTION OR DAMAGE TO PREMISES.**    two (2)    demised premises

If the demised premises become untenantable because of fire or other casualty ~~insurable under standard fire and extended coverage insurance required to be maintained by Owner or Tenant as described in~~ Section 14, the same shall be repaired as speedily as possible at the expense of the Owner and/or Tenant in accordance with their respective covenants to insure provided, however, if more than fifty percent (50%) of the floor area of the development becomes untenantable because of such fire or other casualty or if less than five (5) years of the original term of this lease remain from the date of such fire or other casualty, the Owner may, if it so elects, give notice to Tenant in writing terminating this lease. ~~If the demised premises become untenantable because of any damage or destruction not insurable under standard fire and extended coverage insurance, the Owner may, if it so elects, give notice to Tenant in writing terminating this lease:~~ If Owner elects not to terminate this lease, it shall, within ninety (90) days after such damage or destruction, give the Tenant notice of its intention not to terminate and shall proceed with its portion of restoration, if any, and Tenant shall proceed forthwith with its portion of restoration, each thereafter being obligated to restore in accordance with their respective covenants to insure as set out in Section 14 and each proceeding with reasonable speed to restore the premises.    each party shall proceed with

either Tenant or

Rent shall be abated during the period of any untenantability ~~only if Owner elects to terminate this lease in accordance with the above:~~    the parties elect

the other

INITIALS

7

19.    INSOLVENCY OF TENANT.
In the event of the bankruptcy or insolvency of Tenant, the following shall apply:

(A)    If a petition is filed by, or an order for relief is entered against Tenant under Chapter 7 of the Bankruptcy Code and the trustee of Tenant elects to assume this lease for the purpose of assigning it, such election or assignment, or both, may be made only if all of the terms and conditions of subparagraphs (B) and (D) below are satisfied. To be effective, an election to assume this lease must be in writing and addressed to Owner, and in Owner's business judgment, all of the conditions hereinafter stated, which Owner and Tenant acknowledge to be commercially reasonable, must have been satisfied. If the trustee fails so to elect to assume this lease within sixty (60) days after such filing or order, this lease will be deemed to have been rejected, and Owner shall then immediately be entitled to possession of the demised premises without further obligation to Tenant or the trustee, and this lease shall be terminated. Owner's right to be compensated for damages in the bankruptcy proceeding, however, shall survive such termination.

(B)    If Tenant files a petition for reorganization under Chapters 11 or 13 of the Bankruptcy Code, or if a proceeding filed by or against Tenant under any other chapter of the Bankruptcy Code is converted to a Chapter 11 or 13 proceeding and Tenant's trustee or Tenant as debtor-in-possession fails to assume this lease within sixty (60) days from the date of the filing of such petition or conversion, then the trustee or the debtor-in-possession shall be deemed to have rejected this lease. To be effective, any election to assume this lease must be in writing addressed to Owner and, in Owner's business judgment, all of the following conditions which Owner and Tenant acknowledge to be commercially reasonable, must have been satisfied:

(1)    The Trustee or the debtor-in-possession has cured or has provided to Owner adequate assurance, as defined in this subparagraph (B), that:

(a)    It will cure all monetary defaults under this lease within ten (10) days from the date of assumption; and

(b)    It will cure all nonmonetary defaults under this lease within thirty (30) days from the date of assumption.

(2)    The trustee or the debtor-in-possession has compensated Owner, or has provided Owner with adequate assurance, as hereinafter defined, that within ten (10) days from the date of assumption Owner will be compensated for any pecuniary loss it has incurred arising from the default of Tenant, the trustee, or the debtor-in-possession, as recited in Owner's written statement of pecuniary loss sent to the trustee or debtor-in-possession.

(3)    The trustee or the debtor-in-possession has provided Owner with adequate assurance of the future performance of each of Tenant's obligations under this lease; provided, however, that:

(a)    From and after the date of assumption of this lease, it shall pay all monetary obligations, including the minimum and percentage rents payable under this lease in advance in equal monthly installments on each date that such rents are payable;

(b)    It shall also deposit with Owner, as security for the timely payment of rent, an amount equal to three (3) months' minimum rent and other monetary obligations payable under this lease;

(c)    From and after the date of assumption of this lease, it will pay as minimum rental an amount equal to the sum of the minimum rent otherwise payable under this lease, plus the highest amount of the annual percentage rent paid by Tenant to Owner within the five (5) year period prior to the date of Tenant's petition under the Bankruptcy Code. This amount will be payable in advance in equal monthly installments on each day that the minimum rent is payable;

(d)    If not otherwise required by the terms of this lease, it shall also pay in advance, on each day that any installment of minimum rent is payable, one-twelfth (1/12th) of Tenant's annual tax, escalation and other obligations under this lease; and

(e)    The obligations imposed upon the trustee or the debtor-in-possession will continue for Tenant after the completion of bankruptcy proceedings.

(4)    Owner has determined that the assumption of the lease will not:

(a)    Breach any provision in any other lease, mortgage, financing agreement, or other agreement by which Owner is bound relating to the development; or

(b)    Disrupt, in Owner's judgment, the tenant mix of the development or any other attempt by Owner to provide a specific variety of retail stores in the development which, in Owner's judgment, would be most beneficial to all of the tenants of the development and would enhance the image, reputation, and profitability of the development.

(5)    For purposes of this subparagraph (B), "adequate assurance" means that:

(a)    Owner determines that the Tenant, trustee or the debtor-in-possession has, and will continue to have, sufficient unencumbered assets, after the payment of all secured obligations and administrative expenses, to assure Owner

8

that the trustee or the debtor-in-possession will have sufficient funds timely to fulfill Tenant's obligations under this lease and to keep the demised premises properly staffed with sufficient employees to conduct a fully-operational, actively-promoted business in the demised premises; and

(b)   An order shall have been entered segregating sufficient cash payable to Owner and/or a valid and perfected first lien and security interest shall have been granted in property of Tenant, trustee, or debtor-in-possession which is acceptable in value and kind to Owner, to secure to Owner the obligation of the Tenant, trustee or debtor-in-possession to cure all monetary and nonmonetary defaults under this lease within the time periods set forth above.

(C)   In the event this lease is assumed by a trustee appointed for Tenant or by Tenant as debtor-in-possession under the provisions of subparagraph (B) above and, thereafter, Tenant is either adjudicated a bankrupt or files a subsequent petition for arrangement under Chapter 11 of the Bankruptcy Code, then Owner may, at its option, terminate this lease and all the Tenant's rights under it, by giving written notice of Owner's election so to terminate.

(D)   If the trustee or the debtor-in-possession has assumed this lease, pursuant to subparagraph (A) or (B) above, to assign or to elect to assign Tenant's interest under this lease or the estate created by that interest to any other person, such interest or estate may be assigned only if the intended assignee has provided adequate assurance of future performance, as defined in this subparagraph (D), of all of the terms, covenants, and conditions of this lease. For the purposes of this subparagraph (D) "adequate assurance of future performance" means that Owner has ascertained that each of the following conditions has been satisfied:

(1)   The assignee has submitted a current financial statement, audited by a certified public accountant, which shows a net worth and working capital in amounts determined by Owner to be sufficient to assure the future performance by the assignee of the Tenant's obligations under this lease;

(2)   If requested by Owner, the assignee will obtain guarantees, in form and substance satisfactory to Owner, from one or more persons who satisfy Owner's standards of creditworthiness; and

(3)   The assignee has submitted written evidence, satisfactory to Owner of substantial retailing experience in developments of comparable size to the development which is the subject of this lease and in the sale of merchandise and services permitted under this lease; and

(4)   Owner or the assignee has obtained consents or waivers from any third parties which may be required under any lease, mortgage, financing arrangement, or other agreement by which Owner is bound, to enable Owner to permit such assignment.

(E)   When, pursuant to the Bankruptcy Code, the trustee or the debtor-in-possession is obligated to pay reasonable use and occupancy charges for the use of all or part of the demised premises, it is agreed that such charges will not be less than the minimum rent as defined in this lease, plus percentage rent and other monetary obligations of Tenant included herein.

(F)   Neither Tenant's interest in this lease nor any estate of Tenant created in this lease shall pass to any trustee, receiver, assignee for the benefit of creditors, or any other person or entity, nor otherwise by operation of law under the laws of any state having jurisdiction of the person or property of Tenant, unless Owner consents in writing to such transfer. Owner's acceptance of rent or any other payments from any trustee, receiver, assignee, person, or other entity will not be deemed to have waived, or waive, either the requirement of Owner's consent or Owner's right to terminate this lease for any transfer of Tenant's interest under this lease without such consent.

Notwithstanding anything contained in this lease to the contrary, If a petition is filed by or against Tenant under any chapter of the Bankruptcy Code, Tenant will use its best efforts endeavor to either accept or reject this Lease within thirty (30) days after such filing. Tenant shall pay all amounts due to Owner pursuant to the terms of this Lease which arise from and after the date of such filing promptly upon the date that such amounts are due to Owner. Nothing in this Section shall be deemed to modify any rights Tenant may have pursuant to the Bankruptcy Code or any decision made by judge adjudicating the above-mentioned bankruptcy proceeding.

20.   **HOLDING OVER.**   [1.25]
In the event the Tenant remains in possession of the demised premises, for restoration or otherwise, after the expiration of this lease and without the execution of a new lease, it shall be deemed to be occupying said premises as a tenant from month to month. If Tenant does so continue to remain in possession of the demised premises, it shall pay rent to the Owner at a prorated daily rate of two (2) times the last periodic rental rate specified in Section 4 of this lease; such occupancy shall be subject to all of the other conditions, provisions, and obligations of this lease.

21.   **WAIVER.**   [or Tenant]
One or more waivers of any covenant or condition by the Owner shall not be construed as a waiver of a subsequent breach of the same covenant or condition, and the consent or approval by the Owner to or of any act by the Tenant requiring the Owner's consent or approval shall not be deemed to waive or render unnecessary the Owner's consent or approval to or of any subsequent similar act by the Tenant.



9

22. **PROTECTION FROM SUBROGATION.**
Neither Owner nor Tenant shall be liable to the other for any business interruption or loss or damage to property or injury to or death of persons occurring on the demised premises or the adjoining properties, sidewalks, streets or alleys, or in any manner growing out of or connected with Tenant's use and occupation of said premises, or the condition thereof, or of sidewalks, streets or alleys adjoining caused by the negligence or other fault of Owner or Tenant or of their respective agents, employees, subtenants, licensees or assignees, to the extent that such loss or damage to property or injury to or death of persons is covered by or indemnified by proceeds received from insurance carried by the other party (regardless of whether such insurance is payable to or protects Owner or Tenant or both) or for which such party is otherwise reimbursed; and Owner and Tenant each hereby respectively waive all right of recovery against the other, its agents, employees, subtenants, licensees and assignees, for any such business interruption or loss or damage to property or injury to or death of persons to the extent the same is covered or indemnified by proceeds received from any such insurance, or for which reimbursement is otherwise received, providing that such waiver shall not be operative in any case where the effect thereof is to invalidate such insurance coverage or increase the cost thereof. Nothing in this section contained shall be construed to impose any other or greater liability upon either Owner or Tenant than would have existed in the absence of this section.

23. **NOTICES.**

NOTICES: Modified as of 1-10-13 to the following.

Gordmans, Inc.
12100 West Center Road
Omaha, Nebraska 68144
Attn: President/CEO, EVP of Operations & Chief Financial Officer

...d sufficient notice and service thereof

With a copy to:
Joyce A. Dixon, Esq.
Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102-2186

and if such notice to the Owner is in ...y certified mail with postage prepaid ...).

...s Peper Martin, LLP, 13710 FNB

... be deemed given as follows: if sent by hand delivery, on the day ...ery is refused, if sent by overnight courier, on the following business day, and if sent by certified mail, on the third business day following the date such notice was posted.

24. **CONSTRUCTION OF THIS LEASE.**
Nothing contained herein shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision contained herein, nor any acts of the parties herein, shall be deemed to create any relationship between the parties hereto other than the relationship of Owner and Tenant. Whenever herein the singular number is used, the same shall include the plural, and the neuter gender shall include the feminine and masculine genders. If any provision of this lease shall be held to be invalid, such provision shall be deemed to be a severable provision and the lease itself shall remain in full force and effect as though the invalid provision had not been included herein.

25. **NONLIABILITY OF OWNER.**
The Owner shall not be responsible or liable to the Tenant for any loss or damage that may be occasioned by or through the acts or omissions of persons occupying premises above, below, adjoining or in any other part of the building of which the demised premises are a part or for any loss or damage resulting to the Tenant or its property from bursting, stoppage or leaking water, gas, sewer or steam pipes, except to the extent caused by Owners negligence or intentional wrongful acts.

26. **TAXES.**
Tenant shall be liable for and shall pay before delinquent all taxes levied against or for any leasehold interest or on Tenant's right to occupy the demised premises or on personal property and trade fixtures of whatever kind and to whomever belonging situated or installed in or upon the demised premises. If any such taxes are levied against Owner or Owner's property or if the assessed value of Owner's property is increased by inclusion of personal property and trade fixtures in the demised premises and Owner elects to pay the taxes based on such increase, Tenant shall pay Owner upon demand that part of such taxes for which Tenant is primarily liable hereunder.

Tenant shall be liable for and shall pay Owner each month, in advance, during the term of this lease that amount determined by (a) adding 1/12 of all taxes payable for the year in which the applicable month falls, (b) deducting there from the portion of such taxes billed as common area expense for such month pursuant to Section 8 of this lease, and (c) multiplying the remaining sum by a fraction, the numerator of which shall be the floor area of the demised premises and the denominator of which shall be the total rentable floor area in the development on the first day of the applicable month, excluding rentable floor area in any building which, with the land on which it is erected, comprises a separate tax lot and for which taxes thereon are excluded from (a) above. If for any month the amount of any tax payable during the then current tax year shall not have been determined by the taxing authority, then the tax payable shall be based on the amount of the corresponding tax for the immediately preceding tax year, subject to immediate adjustment when the amount of such tax shall be determined. If any tax shall be levied, assessed or imposed for any fiscal period which does not contain 12 months, then, in making the computation of taxes pursuant to (a) above for each month in such fiscal period, there shall be used in lieu of 1/12 of such tax, that proportion arrived at by dividing such tax by the number of months in such fiscal period.

(excluding special assessments arising out of the development of Wolf Creek Plaza),
For the purposes of determining (a) above the term "taxes" shall include all real estate taxes, assessments and other governmental impositions and charges applicable to the time period commencing on the rent beginning date, of every kind and nature whatsoever, extraordinary as well as ordinary, foreseen and unforeseen, and each and every installment thereof, which shall or may during the term of this lease be levied, assessed, imposed, become due and payable, become liens upon, arise in connection with the use, occupancy or possession of, or grow due or payable out of, or for, the development or any part thereof, or any land, buildings or other improvements therein, excluding, however, any of the foregoing relating to

10

any parcel included in the development which comprises a separate tax lot for the purpose of assessment for real estate taxes and which is occupied by single occupant building(s) or by building(s).

Nothing herein contained shall be construed to include as "taxes" any inheritance, estate, succession, transfer, gift, franchise, corporation, income or profit tax or capital levy that is or may be imposed upon Owner; provided, however, that if at any time the methods of taxation prevailing at the commencement of the term of this lease shall be altered so that in lieu of or as a supplemental, additional or alternative tax for the whole or any part of the taxes now levied, assessed or
imposed on real estate as such there shall be levied, assessed or imposed any substitute, supplemental, additional or alternative tax or license fee imposed upon Owner which is otherwise measured by or based in whole or in part upon the development or any portion thereof, then the same shall be included in the computation of taxes hereunder, computed as if the amount of such tax or fee so payable were that due if the development were the only property of Owner subject thereto.

If Owner receives a refund of any portion of the taxes previously paid by Tenant, Owner shall refund to Tenant the proportion of such refund net of expenses (including attorneys' and appraisers' fees) incurred in obtaining such refund, that is equivalent to the proportion of the original tax paid by Tenant. Tenant shall not institute any proceedings with respect to the assessed valuation of the development or any part thereof for the purpose of securing a tax reduction. Owner, at Owner's sole discretion, may apply for a reduction or correction of any assessment and may appeal or contest any assessment provided all costs and expenses (including attorneys' and appraisers' fees) of such application, appeal or contest shall be, and are hereby specifically agreed to be, included in the definition of "taxes" under this section for purposes of computing the amount defined in (a) above. It is further agreed that if Owner does not institute or file such application, appeal or contest, then ~~if tenants (including Tenant) occupying seventy-five percent (75%) of the floor area of the development (excluding floor area on any parcel included in the development which comprises a separate tax lot for the purpose of assessment for real estate taxes and which is occupied by single occupant building(s) or by building(s) owned other than by Owner)~~ shall desire to have such proceedings instituted or filed and shall give Owner written notice of such desire at least twenty (20) days prior to the last day for the institution or filing of same, then Owner shall institute and diligently prosecute such proceeding provided all costs and expenses (including attorneys' and appraisers' fees) thereof shall be included in the definition of "taxes" hereinabove and provided Owner may ~~at any time~~ settle such proceedings without the consent of Tenant and said other Tenants. ~~Any application, appeal or contest instituted hereunder shall be prosecuted under the sole discretion and control of the~~ Owner, and Tenant agrees to cooperate with Owner in any such application, appeal or contest.

[handwritten margin notes: "not", "each other", "if Tenant", "or Tenant"]

27.  **EXCUSE FOR NONPERFORMANCE.**
The performance of any obligation or undertaking provided for herein by Owner shall be excused and no default shall be deemed to exist in the event, and so long as the performance of any such obligation is prevented, delayed, retarded, or hindered by act of God; fire; earthquake; flood; explosion; action of the elements; war; invasion; insurrection; riot; mob violence; sabotage; inability to procure or general shortage of labor, equipment, facilities, materials, or supplies in the open market; failure of transportation; strikes; lockouts; action of labor unions; condemnation; requisition; laws; orders of government or civil or military or naval authorities; or any other cause beyond the control of the Owner or Tenant as applicable.

28.  **ALTERATIONS, ADDITIONAL STRUCTURES AND PARKING RATIO.**
~~Owner reserves the right to make alterations to the development and to erect or cause others to erect additional building structures which may be above or adjoin the demised premises or which may be in the parking areas or elsewhere in said development; and the~~ Owner may construct double decked, underground, or elevated parking areas and/or rearrange the parking or common areas providing, however, that the Owner shall during the entire term of this lease provide a parking ration of not less than four (4) car spaces of paved parking for each 1,000 square feet of total rented, sales and offices area.

[handwritten margin note: "or Owner occupied"]

29.  **SPRINKLER SYSTEM.**
~~Owner has installed, is hereby granted the option to install, or has caused to be installed an automatic sprinkler system (which may include any fire, smoke, or heat detection system) within the demised premises.~~ If a sprinkler system is installed, Tenant agrees that it will operate it, maintain it in good operating condition, and update and remodel it from time to time as may be made necessary by any remodeling, repartitioning, refinishing, or redecorating of the demised premises by the Tenant. The term "update and remodel" as used herein shall include the moving or adding of any sprinkler heads, modification, or other alterations to the system as may be required within the demised premises to keep the system in compliance with the standards and recommendations of the inspection or rate setting authority of the State. If a sprinkler system is installed by Owner in the demised premises, Tenant further agrees that it will install and maintain a sprinkler system monitoring system in service with ADT or other monitoring agency and carry insurance as necessary to protect against any losses arising from the sprinkler system. If a sprinkler system is installed, Owner agrees that it will provide and maintain in operating condition a bulk water main to the demised premises. Owner shall not be held liable for any interruption of water service to the demised premises. ~~If a sprinkler system is installed, then in consideration for said system and for the providing and maintaining of the bulk water main service, Tenant agrees that it will pay to the Owner monthly, in advance, one and one-fourth cents ($0.0125) per square foot of Tenant's demised are that is sprinklered.~~

30.  **TENANT'S DEFAULT IN PAYMENTS.**
If Tenant defaults in the payment of any rent or other sums due and payable to Owner under this Lease and such default continues for a period of ten (10) days after written notice of such default has been given by Owner to Tenant, or if Tenant shall violate or default in the performance of any covenants, agreements, stipulations, or other conditions contained herein (other than the payment of rent or other sums payable under this lease) and such violation or default continues for a period of thirty (30) days after written notice of such violation or default has been given by Owner to Tenant or, in the case of a default not curable within thirty (30) days, if Tenant shall fail to commence to cure the same within thirty (30) days and thereafter

[handwritten initials box labeled "INITIALS"]

11

proceed diligently to complete the cure thereof, the Owner may declare Tenant in default of this lease, and at its option, may pursue any rights or remedies, at law or in equity available to Owner. At Owner's option and without waiving any other right of Owner, any unpaid rental amount, if Tenant is more than ten (10) days late on payment of rental more than twice during any twelve (12) month period, shall be one and one-tenth times the amount otherwise due and shall in addition to such increased rent bear interest at the maximum rate allowed by law from the date same are due and payable until paid.

**OWNER'S DEFAULT.**
In case Owner shall default in the performance of any covenant or agreement herein contained and such default shall continue for thirty (30) days after receipt by Owner of written notice thereof given by Tenant or, in the case of a default not curable within thirty (30) days, if Owner shall fail to commence to cure the same within thirty (30) days and thereafter proceed diligently to complete the cure same within thirty (30) days and thereafter proceed diligently to complete the cure thereof, then Tenant, at its option, may pursue any rights or remedies, at law or in equity, available to Tenant.

31. **LEASE IN SHORT FORM.** and Tenant's
Tenant agrees not to record this lease; but each party hereto agrees, on the request of the other, to execute a so-called "short form" of lease in form recordable and reasonably satisfactory to Owner's attorneys. In no event shall such "short form" set forth the rental or other charges payable by Tenant under this lease, and any such "short form" shall expressly state that it is executed pursuant to the provisions contained in this lease and is not intended to vary the terms and conditions of this lease.

32. **ASSIGN.**
The Owner may assign its rights under this lease as security to the holder of one or more mortgages (which term shall include mortgage, trust deed, or other encumbrance) now or hereafter in force against all or any part of the land or improvements of the development and to all advances made or hereafter to be made upon the security thereof, provided that as long as Tenant is not in default of any of the terms of this lease beyond the expiration of any applicable notice or cure period, Tenant's right to quiet possession of the demised premises shall not be disturbed.

**SUBORDINATE.**
Upon request of the Owner, and upon delivery to Tenant of a fully executed Subordination, Non-disturbance, Attornment Agreement substantially in the form of Exhibit C attached hereto and incorporated herein by this reference, ("SNDA Agreement"), Tenant will subordinate its rights hereunder to the lien of one or more mortgages (which term shall include mortgage, trust deed, or other encumbrance) now or hereafter in force against all or any part of the land and improvements of the development and to all advances made or hereafter to be made upon the security thereof.
("SNDA Agreement")
in a timely manner or substitute form provided by lender reasonably acceptable to Tenant

**ATTORNMENT.**
In the event of any default of mortgage (which term shall include mortgage, trust deed, or other encumbrance) by Owner whereby Owner loses title to or possession of the premises covered by such mortgage, the Tenant agrees to attorney-to the mortgagee, any of its successors or assigns (including anyone purchasing said premises at a foreclosure sale) and to recognize said mortgagee or purchaser as the Owner under this lease, provided a SNDA Agreement was executed in connection with such mortgage.

**OWNER LIABILITY.**
Notwithstanding anything to the contrary provided in this lease, it is specifically understood and agreed, such agreement being a primary consideration for execution of this lease, that there shall be absolutely no liability on the part of the Owner, Owner's managing agent, or individual stockholders or partners in the aforementioned entities, their successors or assigns, with respect to any of the terms, covenants and conditions of this lease except to the extent of equity in the property, and that Tenant shall look solely to the equity in the property for satisfaction of any and all remedies of Tenant in the event of any breach of any of the terms, covenants and conditions of this lease to be performed by Owner or Owner's managing agent, such exculpation of liability to be absolute and without any exception whatsoever.
and sale and insurance proceeds from the property

33. **REMEDIES CUMULATIVE.** Tenant and the
The rights, options, elections, and remedies of the Owner contained in this lease shall be cumulative; and no one of them shall be construed as excluding any other or any right, priority, or remedy allowed or provided by law.

34. **SUCCESSORS.**
All rights and liabilities herein given to or imposed upon the respective parties hereto shall extend to and bind the respective heirs, executors, administrators, legal representatives, successors, and assigns of said parties. No rights, however, shall inure to the benefit of any assignee of the Tenant unless the assignment to such assignee has been approved by the Owner in writing as required in Section 14 if such consent is required by Section 14.

35. **TENANT'S PLANS FOR OWNER'S RECORDS.**
In order to enable the Owner to have permanent records of the demised premises as constructed, Tenant agrees that prior to the first opening of the demised premises if any construction is accomplished by Tenant and simultaneously with the completion of any major remodeling or any remodeling of plumbing lines of the demised premises it will submit to the Owner one set of its store front plans, interior plans, interior partitioning plans, heating and cooling plans, lighting and electrical plans, and plumbing plans.

INITIALS

12

36.  **SIGNATURES OF BOTH PARTIES.**
This lease shall not be in effect or binding upon either party until it is signed by both parties.

37.  **OTHER AGREEMENTS.**
The Tenant and the Owner hereby agree that this lease as written represents the entire agreement between the parties and there are no other agreements, written or verbal, between the parties hereto.

38.  **OWNER'S WORK.**
Upon execution of this lease by Owner and Tenant, Owner will deliver to Tenant an architectural footprint identifying perimeter wall dimensions of the demised premises and also showing locations where utilities will enter the demised premises. Tenant, at Tenant's expense, will prepare in accordance with all applicable governmental code requirements, complete construction drawings (hereinafter "drawings") and deliver the same to Owner within sixty (60) days of execution of this lease by both Owner and Tenant. Owner's responsibility is to construct the building shell and building interior finish in accordance with the drawings (such drawings to generally include those items of construction identified on page 1 of Exhibit B to this lease, which is attached hereto and by this reference incorporated herein). Tenant and Owner agree that the cost to Owner for construction of the items shown on the drawings should not exceed $1.85 million. Within thirty (30) days from receipt by Owner of the drawings Owner will provide written notice to Tenant as follows:

A. In the event Owner's construction costs for construction of the items shown on the drawings are projected to exceed $1.85 million, Owner will so notify Tenant in writing, and absent mutual agreement between the parties, this lease will automatically terminate effective thirty (30) days after such written notice from Owner to Tenant;

B. In the event Owner's construction costs for construction of the items shown on the drawings do not exceed $1.85 million, Owner will notify Tenant and the drawings will immediately be submitted to the City of Bellevue for building permit~~and construction beginning~~. *and construction.*

on or before June 1, 2003; if Owner is unable to do so, Owner will pay Tenant liquidated damages of $500 per day until delivery of the demised premises in accordance with this lease section.

It is the intention of the parties that Owner construction of the demised premises will begin on or before October 1, 2002. Once construction begins the Owner will proceed diligently and without interruption with construction until completion. Owner will deliver the demised premises to Tenant with the construction substantially complete ~~within six (6) months from construction beginning.~~ Owner will provide Tenant a two (2) week notice prior to turnover of the demised premises. In the event construction of the demised premises does not for any reason begin on or before

November 1, 2002, this lease may be terminated by either party providing written notice to the other, absent mutual agreement between the parties regarding revised space delivery and rent beginning dates.

Upon completion of Owner's Work, Owner will deliver the demised premises to Tenant for completion by Tenant, at its expense, of leasehold improvement construction. Tenant's work shall include providing all furniture, fixtures, and equipment for the demised premises generally as identified on pages 2 and 3 of Exhibit B to this lease, it being the intention of the parties that the demised premises, at time of Tenant's opening for business, generally resemble Tenant's new store which opened in Spring 2002 at 171st and West Center Road, Omaha, Nebraska.

Owner will provide Tenant with a cash allowance of $387,000.00 upon Tenant's satisfactory completion of its leasehold improvement construction to the demised premises, including providing all furniture, fixtures, and equipment in accordance with pages 2 and 3 of Exhibit B, and opening for business to the general public. Such cash allowance shall be submitted in exchange for Tenant's production of appropriate lien waivers. In the event Owner does not provide Tenant with such cash allowance as provided herein, Tenant has the right to off-set lease Section 4 Rent until such cash allowance amount is paid in full.

39.  **TENANT RENEWAL OPTIONS.**
Tenant is hereby granted two (2) five (5) year options to renew this lease provided said options may only be exercised if Tenant is not in material default beyond the expiration of any applicable notice or cure periods at the time of exercise of such options. The first five (5) year option shall be exercised by Tenant giving notice to Owner not less than nine (9) months prior to the expiration of the initial ten (10) year lease term. The second five (5) year option shall be exercised by Tenant giving notice to Owner not less than nine (9) months prior to the expiration of the fifteenth (15th) year of the lease term (and only in the event Tenant exercised the first five (5) year option).



13

THREE    On page 14, Section 39, delete the typed in rental provisions during Tenant's renewal option periods and substitute in lieu thereof:

"First five (5) year option period:

The sum of Six Hundred One Thousand Eight Hundred and 04/100 Dollars ($601,800.04) annual minimum guaranteed rent, payable in monthly installments of Fifty Thousand One Hundred Fifty and 00/100 Dollars ($50,150.00).

Second five (5) year option period:

The sum of Six Hundred Sixty Three Thousand and 04/100 Dollars ($663,000.04) annual minimum guaranteed rent, payable in monthly installments of Fifty-Five Thousand Two Hundred Fifty and 00/100 Dollars ($55,250.00)."

40.  **FUTURE LEASING RESTRICTION.**
Owner hereby agrees during the term of this lease (provided Tenant is not in material default hereof beyond the expiration of any notice or cure periods) not to lease, sell or permit any space in Wolf Creek Plaza as identified by outline in red in Exhibit A hereto for use as a Goodwill Store, Kohl's, Mervyn's, Ross Department Stores, T.J. Maxx, Marshalls, Goody's, or SteinMart.

This Future Leasing Restriction applies only to leases entered into by Owner subsequent to this lease and shall immediately expire in the event Tenant's business use does not remain consistent with the Section 9 Use identified in this lease.

5.  **MAINTENACE OF COMMON AREAS.  (CONTINUED)**
Notwithstanding anything to the contrary contained herein, costs for the following items shall be the sole obligation of Owner, and such costs shall not be passed through to Tenant: (1) any charges for administration expenses; (2) any charges for capital improvements or for depreciation of capital improvements in connection with the shopping center, including but not limited to the replacement of any and all driveways, sidewalks, streets and parking areas provided, ~~repaving and~~ overlaying of portions of the asphalt parking areas as part of a normal program of parking lot maintenance and repair shall be included; (3) any principal or interest payments on the loans secured by mortgages on the shopping center or any part thereof; (4) the cost of any special service provided to a tenant of the shopping center which is not provided generally to the other tenants of the shopping center; (5) cost and expenses incurred in connection with leasing space at the shopping center, including, without limitation, leasing commissions, advertising and promotional expenses, and legal fees for the preparation of leases; (6) rents payable with respect to any leasing
office; (7) court costs and legal fees incurred to enforce the obligations of other tenants of the shopping center; (8) costs recoverable by Owner pursuant to its insurance policies; and (9) costs resulting from defects in design, construction or workmanship of Owner's construction obligations and materials used in same.

6.  **USE.  (CONTINUED)**
A.  to conform to a change in retail use compatible and identical to all other Gordmans retail stores so long as such new use does not violate any exclusive provided Owner to any other Tenant at Wolf Creek Plaza and,

B.  as part of an approved lease Section 17 Lease Assignment so long as the new retail use does not violate any exclusive provided Owner to any other Tenant at Wolf Creek Plaza.

, footwear, accessories ? home fashions.

Notwithstanding anything, to the contrary contained in this lease, in the event Owner has a reasonable objection with any material Tenant change of use from Tenants initial use of the demised premises as a retail store for sale to the general public of name brand apparel/merchandise for men, women, and children, Owner may upon sixty (60) days prior written notice to Tenant, so inform Tenant and terminate this lease, in which event upon the effective date of such termination this lease shall be cancelled, void, and of no further force and effect with the rights of Owner and Tenant being the same as in the case of lease expiration; provided, at any time during such sixty (60) day period, Tenant may change its use to the initial use or other use not reasonably objectionable to Owner, and upon such change, Owner's termination notice shall be considered null and void.  If a change in use is requested in connection with an assignment or sublease of Tenant's interest in this lease, and Owner approves the assignment or sublease, Owner shall be deemed to have approved the change in use.



IN WITNESS WHEREOF, the Owner and the Tenant have executed this lease on the day and year first above written.

President _____

_____

OWNER

Attest:

Secretary

GENERAL NOTARY – State of Nebraska
MICHAEL T. GRECO
My Comm. Exp. 5-1-07

_____

TENANT

Attest:

GENERAL NOTARY-State of Nebraska
URZENDOWSKI
My Comm. Exp. Apr. 26, 2004

EXHIBIT A



# FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE (the "Amendment") is entered into as of the ___ day of ⁷ ⁸ ᵒᶜᵗ , 2002, between MIKE HOGAN DEVELOPMENT COMPANY, INC., a Nebraska corporation (the "Landlord") and GORDMANS, INC., a Delaware corporation (the "Tenant"). Capitalized terms not defined herein shall have their respective meanings as set forth in the Lease (as defined below).

**WHEREAS,** the Landlord and Tenant entered into that certain lease (the "Lease") dated June 17, 2002, whereby the Tenant agreed to lease approximately 50,000 square feet of floor area to be constructed pursuant to the Lease in Wolf Creek Plaza in Bellevue, Nebraska (the "Leased Premises");

**WHEREAS,** pursuant to Section 38 of the Lease, the Landlord and the Tenant have agreed to accept responsibility for certain aspects of the construction and completion of the Leased Premises; and

**WHEREAS,** Landlord and Tenant desire to amend such Lease under the terms and conditions specified herein in order to further clarify each party's costs and responsibilities with respect to the construction and completion of the Leased Premises.

**NOW, THEREFORE,** in consideration of the covenants contained herein, the parties hereto agree as follows:

**Section 1:**      Those items of construction listed on Exhibit "A" attached hereto and incorporated herein by this reference, shall constitute a portion of Owner's Work, for which the Landlord shall have sole responsibility pursuant to Section 38 of the Lease, and that Exhibit "A" to this Amendment shall replace in its entirety page 1 of Exhibit "B" of the Lease. It is understood that the Landlord will have additional cost items (i.e. utility charges to provide heat over winter construction months estimated at over $15,000) that are not included on this amended page 1 of Exhibit "B."

**Section 2:**      Those items listed on Exhibit "B" attached hereto and incorporated herein by this reference, shall constitute a portion of Tenant's work pursuant to the Lease for which the Tenant shall have sole responsibility pursuant to Section 38 of the Lease.

**Section 3.**      Landlord hereby rescinds the letter delivered to Tenant on September 12, 2002 purporting to terminate the Lease and the parties hereby agree that the Lease remains in full force and effect as of the date hereof, except as expressly provided in this Amendment.

**Section 4.**      This Amendment may be executed in counterparts and such counterparts together shall constitute a single agreement.

**Section 5.**      This Amendment shall be effective as of the date first written above.

**Section 6.**     Each of the Landlord and Tenant hereby represent and warrant that it is authorized to execute, deliver and perform its obligations under this Amendment.

LANDLORD:                         Mike Hogan Development Company, Inc., a
                                  Nebraska corporation

                                  By: _____ Michael Hogan _____
                                  Name: _Michael Hogan_
                                  Title: ___Pres___

TENANT:                           GORDMANS, INC., a Delaware
                                  corporation

                                  By: _____
                                  Name: _Jeff Gordman_
                                  Title: _President & CEO_

## EXHIBIT A

### Owner's Work

| Date | 9/17/2002 | Gordman Bids | |
|---|---|---|---|
| **Shell** | | | |
| Masonary footings and block | | $ | 296,000.00 |
| Steel | | $ | 120,425.00 |
| Steel Erection | | $ | 68,410.00 |
| Roof | | $ | 152,720.00 |
| Framing inside,outside, efis and drywall | | $ | 238,080.00 |
| Concrete floor, steps, compactor and loading dock | | $ | 133,118.00 |
| Loading dock equipment | | $ | 11,014.00 |
| Caulking, misc, carpetry, etc. | | $ | 10,000.00 |
| Area Total | | $ | 1,028,767.00 |
| **Interior** | | | |
| Hvac | | $ | 107,300.00 |
| Electrical | | $ | 177,769.00 |
| Plumbing | | $ | 27,850.00 |
| Glass Storefront | | $ | 39,956.00 |
| Carpet, labor & misc. flooring | | $ | 76,017.73 |
| Paint | | $ | 60,300.00 |
| Doors, misc. | | $ | 23,333.00 |
| Fire Alarms | | | |
| Fire Sprinkler | | $ | 33,200.00 |
| Interior casing & labor, misc trim, casters wheels | | | |
| misc. materials and counter tops | | $ | 6,000.00 |
| Area Total | | $ | 551,725.73 |
| **General Fees** | | | |
| Cleanup | | $ | 17,000.00 |
| Insurance | | $ | 4,000.00 |
| Permits | | $ | 15,855.30 |
| Testing | | $ | 5,000.00 |
| General Conditions | | $ | 110,634.49 |
| Overhead & Profit | | $ | 110,634.49 |
| Professional Fees | | | |
| Area Total | | $ | 263,124.28 |
| **Grand Total** | | $ | 1,843,617.01 |

## EXHIBIT B

**Tenant's Work**

9-16-02

| ITEMS PER PRINT TO BE FURNISHED BY GORDMAN'S | ESTIMATED PRICES |
|---|---|
| Crown molding and labor | 3,200.00 |
| Lamlite rings and labor | 8,000.00 |
| Standards and labor | 4,100.00 |
| Valance MDO board and labor | 1,650.00 |
| Labor for McCue bumpers | 400.00 |
| Fitting room hooks and labor | 200.00 |
| Fitting room bench and labor | 400.00 |
| Slate wall labor and material | 1,900.00 |
| Laminate wainscote and labor, toilet partitions, grab bars, fire ext., and labor for all of this. | 5,039.00 |
| | $24,889.00 |

# SECOND AMENDMENT TO LEASE

This SECOND AMENDMENT TO LEASE (the "Amendment") is entered into as of the 21st day of February, 2003, between MIKE HOGAN DEVELOPMENT COMPANY, INC., a Nebraska corporation (the "Landlord") and GORDMANS, INC., a Delaware corporation (the "Tenant").  Capitalized terms not defined herein shall have their respective meanings as set forth in the Lease (as defined below).

WHEREAS, the Landlord and Tenant entered into that certain lease (the "Lease") dated June 17, 2002, whereby the Tenant agreed to lease approximately 50,000 square feet of floor area to be constructed pursuant to the Lease in Wolf Creek Plaza in Bellevue, Nebraska (the "Leased Premises");

WHEREAS, pursuant to Section 38 of the Lease, the Landlord and the Tenant have agreed to accept responsibility for certain aspects of the construction and completion of the Leased Premises;

WHEREAS, the Landlord and Tenant have entered into the First Amendment to Lease, dated as of October 7, 2002, whereby certain items of construction where designated as Tenant's work or Owner's Work (the "First Amendment");

WHEREAS, pursuant to the First Amendment, the parties have designated the items listed on Exhibit "A" attached hereto as Tenant's work for which the Tenant shall have sole responsibility pursuant to Section 38 of the Lease; and

WHEREAS, Landlord and Tenant desire to further amend the Lease and the First Amendment in order that the items listed on Exhibit "A" hereto shall be re-designated as Owner's Work, which shall be the sole responsibility of the Landlord pursuant to Section 38 of the Lease.

NOW, THEREFORE, in consideration of the covenants contained herein, the parties hereto agree as follows:

**Section 1.**     Those items of construction listed on Exhibit "A" attached hereto and incorporated herein by this reference, shall constitute a portion of Owner's Work, for which the Landlord shall have sole responsibility pursuant to Section 38 of the Lease, and that Exhibit "A" to this Amendment shall be added to and be considered a part of page 1 of Exhibit "B" of the Lease.  It is understood by the Landlord and the Tenant that the items listed on Exhibit "A" hereto are in addition to any items of construction already set forth on page 1 of Exhibit "B" of the Lease and any and all other cost items (i.e. utility charges to provide heat over winter construction months estimated at over $15,000) that are not included on page 1 of Exhibit "B" of the Lease that are the responsibility of the Landlord.

**Section 2.**     The amount payable by the Landlord to the Tenant as a cash allowance to be paid upon the Tenant's satisfactory completion of its leasehold improvement construction

OM-147721-1

-1-

pursuant to Section 38 of the Lease shall be reduced from $387,000.00 to $362,111.00 as a result of the change of the items of construction listed on Exhibit "A" hereto from Tenant's work to Owner's Work pursuant to Section 1 of this Amendment.

**Section 3.**    This Amendment may be executed in counterparts and such counterparts together shall constitute a single agreement.

**Section 4.**    This Amendment shall be effective as of the date first written above.

**Section 5.**    Each of the Landlord and Tenant hereby represent and warrant that it is authorized to execute, deliver and perform its obligations under this Amendment.

LANDLORD:                    Mike Hogan Development Company, Inc., a
                             Nebraska corporation

                             By: _____
                             Name: _____
                             Title: _____

TENANT:                      GORDMANS, INC., a Delaware
                             corporation

                             By: _____
                             Name: _____
                             Title: _____

OM-147721-1

-2-

<u>EXHIBIT A</u>

Owner's Work

9-16-02

| ITEMS PER PRINT TO BE FURNISHED | ESTIMATED PRICES |
|---|---|
| Crown molding and labor | 3,200.00 |
| Lamlite rings and labor | 8,000.00 |
| Standards and labor | 4,100.00 |
| Valance MDO board and labor | 1,650.00 |
| Labor for McCue bumpers | 400.00 |
| Fitting room hooks and labor | 200.00 |
| Fitting room bench and labor | 400.00 |
| Slate wall labor and material | 1,900.00 |
| Laminate wainscote and labor, toilet partitions, grab bars, fire ext., and labor for all of this. | 5,039.00 |
| | $24,889.00 |

<u>THIRD AMENDMENT TO LEASE</u>

THIS FIRST AMENDMENT TO LEASE is made this 6th day of July, 2003, by and between MIKE HOGAN DEVELOPMENT COMPANY, INC., a Nebraska corporation with offices at 818 Tara Plaza, Papillion, Nebraska 68046, hereinafter referred to as "Owner", and GORDMANS, INC. (d/b/a Gordmans), a Nebraska corporation with offices at 12100 West Center Road, Omaha, Nebraska 68144, hereinafter referred to as "Tenant".

WITNESSETH:

WHEREAS, Owner and Tenant entered into a lease dated June 17, 2002 for space in Wolf Creek Plaza, a retail development in Bellevue, Nebraska; and

WHEREAS, Owner and Tenant desire to amend said lease;

NOW THEREFORE, the consideration for this agreement being the mutual covenants contained herein, Owner and Tenant agree as follows:

ONE   On page 1 delete: "50,000 square feet" and substitute in lieu thereof "51,000 square feet".

TWO   On page 3, Section 4, delete the typed in rental provisions and substitute in lieu thereof the following:

"First through fifth lease years:   $497,250.00 each lease year, payable $41,437.50 each month.

Sixth through tenth lease years:   $548,250.00 each lease year, payable $45,687.50 each month."

THREE   On page 14, Section 39, delete the typed in rental provisions during Tenant's renewal option periods and substitute in lieu thereof:

"First five (5) year option period:

The sum of Six Hundred One Thousand Eight Hundred and 04/100 Dollars ($601,800.04) annual minimum guaranteed rent, payable in monthly installments of Fifty Thousand One Hundred Fifty and 00/100 Dollars ($50,150.00).

Second five (5) year option period:

The sum of Six Hundred Sixty Three Thousand and 04/100 Dollars ($663,000.04) annual minimum guaranteed rent, payable in monthly installments of Fifty-Five Thousand Two Hundred Fifty and 00/100 Dollars ($55,250.00)."

Except as amended herein the June 17, 2002 lease shall in all respects remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this agreement effective on the day and year first above written.

MIKE HOGAN DEVELOPMENT COMPANY, INC.

President                    OWNER

Attest:

Secretary

GORDMANS, INC. (d/b/a Gordmans)

President                    TENANT

Attest:

Secretary

STATE OF NEBRASKA   )
                    )
COUNTY OF DOUGLAS )

On this _25_ day of _July_ , 2003, before me, a notary public in and for said county and state, personally appeared _Michael J. Hogan_ and _Clare J. Cholet_ , to me personally known, who being by me duly sworn did say that they are respectively the PRESIDENT and SECRETARY of said MIKE HOGAN DEVELOPMENT COMPANY, INC. and that the seal, if affixed to said instrument, is the seal of said corporation and that said instrument was executed in behalf of said corporation by authority of its Board of Directors; and said _President_ and _Secretary_ acknowledged the execution of said instrument to be the voluntary act and deed of said corporation.

Witness my hand and notarial seal the day and year last above written.

_Maureen McPherson_
Notary Public

> GENERAL NOTARY - State of Nebraska
> MAUREEN McPHERSON
> My Comm. Exp. May 9, 2007

STATE OF NEBRASKA   )
                    )
COUNTY OF DOUGLAS )

On this _21st_ day of _July_ , 2003, before me, a notary public in and for said county and state, personally appeared _Jeff Gordman_ and _Jeffrey Byal_ , to me personally known, who being by me duly sworn did say that they are respectively the PRESIDENT and SECRETARY of said   _GORDMANS, INC. (d/b/a Gordmans)_   and that the seal, if affixed to said instrument, is the seal of said corporation and that said instrument was executed in behalf of said corporation by authority of its Board of Directors; and said _President_ and _Secretary_ acknowledged the execution of said instrument to be the voluntary act and deed of said corporation.

Witness my hand and notarial seal the day and year last above written.

_Debra Turner_
Notary Public



> GENERAL NOTARY-State of Nebraska
> DEBRA TURNER
> My Comm. Exp. Dec. 18, 2005

## FOURTH AMENDMENT TO LEASE

THIS **FOURTH AMENDMENT TO LEASE** ("Amendment") is made and entered into this ___14___ day of _Dec_____, 2012, by and between **WOLF CREEK CENTER, LLC**, a Nebraska limited liability company ("Landlord"), and **GORDMANS, INC.**, a Delaware corporation, d/b/a Gordmans ("Tenant").

WHEREAS, pursuant to that certain Lease dated June 17, 2002 between Mike Hogan Development Company, Inc., the predecessor-in-interest to Landlord ("Hogan Development"), and Tenant, as amended by that certain First Amendment to Lease dated October 7, 2002 between Hogan Development and Tenant, as amended by that certain Second Amendment to Lease dated February 21, 2003 between Hogan Development and Tenant, and as further amended by that certain Third Amendment to Lease dated July 6, 2003 between Hogan Development and Tenant (as so amended and modified, the "Lease"), Landlord leases to Tenant approximately 51,000 square feet of floor area commonly known as Space No. 150 (the "Leased Premises") in the shopping center commonly referred to as "Wolf Creek Plaza" in Bellevue, Nebraska; and

WHEREAS, Landlord and Tenant desire to amend the Lease in accordance with the terms and provisions set forth below.

NOW THEREFORE, for and in consideration of the forgoing premises and mutual promises and covenants of the parties hereto, as set forth herein and in the Lease, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree to amend the Lease as follows:

1.    Exercise of First Renewal Option.  In accordance with the terms of Section 39 of the Lease, Tenant hereby exercises its first 5-year renewal option.  Landlord and Tenant acknowledge and agree that the term of the Lease is hereby extended to September 30, 2018.

2.    Minimum Rent During Renewal Option.  Section 39 of the Lease is hereby amended such that the annual minimum guaranteed rent to be paid by Tenant during the first 5-year option period shall be reduced to $548,250.00 per year (based on $10.75 per square foot of floor area of the Leased Premises), and shall be payable by Tenant to Landlord as provided in the Lease in monthly installments of $45,687.50.

3.    Tenant Improvement Contribution.  Within twenty-one (21) days following the Effective Date (as defined below) of this Amendment, Landlord shall pay to Tenant, in immediately available funds, an amount equal to $100,000.00 as an improvement contribution (the "Tenant Improvement Contribution"), which Tenant Improvement Contribution may be used by Tenant in its sole discretion for any purpose (other than for the purchasing of inventory) related to Tenant's construction of certain tenant improvements to the Leased Premises.  Except with respect to the payment of the Tenant Improvement Contribution as set forth herein, Landlord shall have no obligation to pay for any such tenant improvements to the Leased Premises constructed by Tenant.  Tenant shall construct its tenant improvements in accordance with the terms and conditions of the Lease.  In the event that Landlord fails to timely pay the Tenant Improvement Contribution to Tenant in accordance with the terms of this Amendment, Tenant, without waiving any other rights or remedies it may have, shall be entitled to offset the amount of such unpaid Tenant Improvement Contribution against any amounts due or coming due by Tenant to Landlord under the Lease.

4.    Notice Address.  Tenant's legal address for notice set forth in Section 23 of the Lease is hereby modified as follows:

1

Gordmans, Inc.
12100 West Center Road
Omaha, Nebraska 68144
Attn: President/CEO, EVP of Operations &
Chief Financial Officer

With a copy to:
Joyce A. Dixon, Esq.
Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102-2186

5.    Conflicts; Ratification.  In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall supersede and control.  The Lease, as amended by this Amendment, contains the entire agreement of the parties hereto and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect.  Except as herein modified and amended, all terms and conditions of the Lease are incorporated herein and shall remain in full force and effect, and are hereby ratified and confirmed by Landlord and Tenant.  The execution of this Amendment shall in no event be deemed to constitute a waiver of any right or claim of either Landlord or Tenant under or by virtue of the Lease.

6.    Authority. This Amendment is binding upon and inures to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns. Except as expressly provided herein, neither Tenant nor Landlord have assigned or transferred any interest in the Lease, as amended, and each represents to the other that they have full power and authority to execute this Amendment and that no consents of third parties (other than Landlord's mortgage lender) are necessary for their execution and performance of this Amendment.  The persons signing this Amendment have been duly authorized to sign on behalf of such party and such party has the right to consent to the matters set forth herein.  It is hereby acknowledged that this Amendment is conditioned upon the approval by Landlord's mortgage lender; and notwithstanding the fact that Landlord and Tenant have executed this Amendment as of the date first above, this Amendment will not be effective until Landlord's mortgage lender has consented to this Amendment in writing.  The date upon which this Amendment has been executed by Tenant, Landlord and Landlord's mortgage lender shall be referred to herein as the "Effective Date."  If Landlord's mortgage lender's consent to this Amendment has not been obtained and provided to Tenant in writing by December 21, 2012, this Amendment may be rescinded by Tenant upon written notice thereof to Landlord and, in such event, this Amendment shall become null and void and all terms of the Lease, without giving effect to this Amendment, shall remain in full force and effect.

7.    Capitalized Terms; Recitals.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Lease.  The above recitals are incorporated herein by reference.

8.    Counterparts.  This Amendment may be executed in counterparts, all of which taken together shall be deemed one original, and shall be effective upon execution thereof by Landlord and Tenant, notwithstanding the fact that both of the parties hereto are not signatories to the original or same counterpart.  Any signature of Landlord or Tenant which is delivered by facsimile, photocopy or electronic means (scan and email) shall be deemed to be an original signature and shall be effective upon receipt thereof.

*(Remainder of page intentionally left blank.)*

1

4846-5536-1553.3

IN WITNESS WHEREOF, Tenant and Landlord have executed this Amendment as of the date first above written.

LANDLORD:

**WOLF CREEK CENTER, LLC**, a Nebraska limited liability company

By: *Michael J Hogan*
Name:
Title: *Manager*

TENANT:

**GORDMANS, INC.**, a Delaware corporation

By:
Name: *Jeff Gordman*
Title: *President and CEO*

1

## CONSENT TO FOURTH AMENDMENT TO LEASE

**ING INVESTMENT MANAGEMENT, LLC** ("Lender"), hereby consents to the Fourth Amendment to Lease ("Amendment"), dated DEC 14, 2012, by and between Wolf Creek Center LLC, a Nebraska limited liability company ("Landlord"), and Gordmans, Inc., a Delaware corporation, d/b/a Gordmans ("Tenant"), which amends that certain Lease dated June 17, 2002 between Mike Hogan Development Company, Inc., the predecessor-in-interest to Landlord ("Hogan Development"), and Tenant, as amended by that certain First Amendment to Lease dated October 7, 2002 between Hogan Development and Tenant, as amended by that certain Second Amendment to Lease dated February 21, 2003 between Hogan Development and Tenant, and as further amended by that certain Third Amendment to Lease dated July 6, 2003 between Hogan Development and Tenant (as so amended and modified, the "Lease"), with respect to approximately 51,000 square feet of floor area commonly known as Space No. 150 ("the Leased Premises") in the shopping center commonly referred to as "Wolf Creek Plaza" in Bellevue, Nebraska.   Lender   is   the   "Mortgagee"   with   respect   to   that   certain DEED OF TRUST, SECURITY AGREEMENT,   recorded   in   SARPY   County, Nebraska as Instrument No. 2006 - 02734 against the fee interest underlying the Leased Premises and hereby acknowledges its approval of the Amendment.

Executed to be effective as of FEBRUARY 14, 2012.

ING INVESTMENT MANAGEMENT, LLC

By: _____
Name:   John P. Foley
Title:   Vice President

## FIFTH AMENDMENT TO LEASE

THIS **FIFTH AMENDMENT TO LEASE** ("Amendment") is made and entered into this 30th day of November, 2016, by and between **WOLF CREEK CENTER, LLC**, a Nebraska limited liability company ("Landlord"), and **GORDMANS, INC.**, a Delaware corporation, d/b/a Gordmans ("Tenant").

WHEREAS, Mike Hogan Development Company, Inc., the predecessor-in-interest to Landlord ("Original Landlord"), and Tenant entered into that certain Lease dated June 17, 2002 (the "Original Lease") whereby Original Landlord leased to Tenant approximately 51,000 square feet of floor area commonly known as Space No. 150 (the "Leased Premises") in the shopping center commonly referred to as "Wolf Creek Plaza" in Bellevue, Nebraska; and

WHEREAS, the Original Lease was amended by (a) that certain First Amendment to Lease dated October 7, 2002 between Original Landlord and Tenant, (b) that certain Second Amendment to Lease dated February 21, 2003 between Original Landlord and Tenant, (c) that certain Third Amendment to Lease dated July 6, 2003 between Original Landlord and Tenant, and (d) that certain Fourth Amendment to Lease dated December 14, 2012 between Landlord and Tenant (the Original Lease, as amended, the "Lease").  Capitalized terms, which are used but not defined herein, shall have the same meanings assigned to such terms in the Lease; and

WHEREAS, Landlord and Tenant desire to amend the Lease in accordance with the terms and provisions set forth below.

NOW THEREFORE, for and in consideration of the forgoing premises and mutual promises and covenants of the parties hereto, as set forth herein and in the Lease, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby agree to amend the Lease as follows:

1.    Exercise of First Renewal Option.  In accordance with the terms of Section 39 of the Lease, Tenant hereby exercises its second 5-year renewal option.  Landlord and Tenant acknowledge and agree that the term of the Lease is hereby extended to September 30, 2023.

2.    Minimum Rent During Renewal Option.  Section 39 of the Lease is hereby amended such that the annual minimum guaranteed rent to be paid by Tenant during the second 5-year option period shall be $548,250.00 per year (based on $10.75 per square foot of floor area of the Leased Premises), and shall be payable by Tenant to Landlord as provided in the Lease in monthly installments of $45,687.50.

3.    HVAC.  Tenant shall obtain, at Tenant's expense, and shall maintain throughout the term of the Lease, a service contract, with a licensed contractor, for the regular maintenance and changing of filters of the heating, ventilation and air-conditioning systems and equipment serving the Leased Premises (the "HVAC") on a quarterly basis.  Notwithstanding the foregoing, Section 8 of the Lease is hereby amended to provide that Landlord shall be responsible, at its sole cost, for all repairs, maintenance and replacement of the HVAC that cost in excess of $1,000.  Landlord shall perform such obligation to repair, maintain and replace the HVAC so that such HVAC shall be kept in good working order, repair and condition.

4.    Notice Address.  Tenant's legal address for notice set forth in Section 23 of the Lease is hereby modified as follows:

Gordmans, Inc.
1926 South 67th Street

4851-9958-0221.3

1

Omaha, NE 68106
Attention:      Chief Financial Officer and Senior Vice President of Stores

with copies to:

Kutak Rock LLP
1650 Farnam Street
Omaha, NE 68102
Attn: Gordmans Lease Partner

and

Mr. Allan Murow (or successor)
N&M Brokerage Services, L.L.C.
Suite 250
2285 South 67th Street
Omaha, NE 68106


5.      Conflicts; Ratification. In the event of any conflict between the terms and provisions of this Amendment and the terms and provisions of the Lease, the terms and provisions of this Amendment shall supersede and control. The Lease, as amended by this Amendment, contains the entire agreement of the parties hereto and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect. Except as herein modified and amended, all terms and conditions of the Lease are incorporated herein and shall remain in full force and effect, and are hereby ratified and confirmed by Landlord and Tenant. The execution of this Amendment shall in no event be deemed to constitute a waiver of any right or claim of either Landlord or Tenant under or by virtue of the Lease. All references to the "Owner", which are set forth in the Lease, shall refer to Landlord.

6.      Authority. This Amendment is binding upon and inures to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns. Except as expressly provided herein, neither Tenant nor Landlord have assigned or transferred any interest in the Lease, as amended, and each represents to the other that they have full power and authority to execute this Amendment and that no consents of third parties (other than Landlord's mortgage lender) are necessary for their execution and performance of this Amendment. The persons signing this Amendment have been duly authorized to sign on behalf of such party and such party has the right to consent to the matters set forth herein. It is hereby acknowledged that this Amendment is conditioned upon the approval by Landlord's mortgage lender; and notwithstanding the fact that Landlord and Tenant have executed this Amendment as of the date first above, this Amendment will not be effective until Landlord's mortgage lender has consented to this Amendment in writing. The date upon which this Amendment has been executed by Tenant, Landlord and Landlord's mortgage lender shall be referred to herein as the "Effective Date." If Landlord's mortgage lender's consent to this Amendment has not been obtained and provided to Tenant in writing within thirty (30) days following the execution of this Amendment by Landlord and Tenant, this Amendment may be rescinded by Tenant upon written notice thereof to Landlord and, in such event, this Amendment shall become null and void and all terms of the Lease, without giving effect to this Amendment, shall remain in full force and effect.

7.      Counterparts. This Amendment may be executed in counterparts, all of which taken together shall be deemed one original, and shall be effective upon execution thereof by Landlord and Tenant, notwithstanding the fact that both of the parties hereto are not signatories to the original or same counterpart. Any signature of Landlord or Tenant which is delivered by facsimile, photocopy or

4851-9958-0221.3

electronic means (scan and email) shall be deemed to be an original signature and shall be effective upon receipt thereof.

*(Remainder of page intentionally left blank.)*

4851-9958-0221.3

IN WITNESS WHEREOF, Tenant and Landlord have executed this Amendment as of the date first above written.

LANDLORD:

**WOLF CREEK CENTER, LLC,** a Nebraska limited liability company

By: _____

Name: _KYLE RICHARDS_____

Title: _MANAGER_____

TENANT:

**GORDMANS, INC.,** a Delaware corporation

By: _____

Name: _ANDREW T. HALL_____

Title: _PRES/CEO_____

4

4851-9958-0221.3